230 F.3d 543 (2nd Cir. 2000)
 ZONELL WRIGHT, SIMON VARGAS, TARA DIXON, MARIO LAMBOY, and ROBERT THOMPSON, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants, v.
RUDOLPH GIULIANI, as Mayor of the City of New York, JASON TURNER, as Commissioner of the Human Resources Administration of the City of New York, Department of Social Services, and GREGORY CALDWELL, as Deputy Commissioner of AIDS Services Income Support of the City of New York, Defendants-Appellees.
 Docket No. 00-7853
No. 823--August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: September 26, 2000
Decided: October 25, 2000
 
 Appeal from a judgment of the United States District Court for the Southern District of New York, William H. Pauley, Judge, denying, inter alia, plaintiffs' motion for a preliminary injunction.
 Affirmed.
 ARMEN H. MERJIAN, New York, N.Y. (Russell E. Brooks, on the brief), for Plaintiffs-Appellants.
 MARTA ROSS, New York, N.Y. (Edward F.X. Hart and Georgia Pestana, on the brief), for Defendants-Appellees.
 Before: CARDAMONE, McLAUGHLIN and JACOBS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiffs, five homeless individuals who have been diagnosed with clinical symptomatic Human Immunodeficiency Virus ("HIV") or Advanced Immune Deficiency Syndrome ("AIDS"), brought suit on behalf of themselves and a putative class alleging that various officials of the City of New York have failed to provide them with emergency housing that accommodates their disability, as required by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act") and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 (the "ADA"). On expedited appeal, they challenge the portion of a memorandum and order entered June 14, 2000 in the United States District Court for the Southern District of New York (Pauley, J.) denying their request for preliminary injunctive relief. We affirm for the reasons set forth below.
 
 BACKGROUND
 
 2
 Plaintiffs challenge the adequacy of emergency housing administered by the New York City Human Resources Administration ("HRA") Division of AIDS Services Income Support ("DASIS"). Plaintiffs are all eligible for emergency housing provided by DASIS, and have resided in such housing; but they claim that their precarious health is endangered by living there, and that therefore they have been denied meaningful access to emergency shelter in violation of the Rehabilitation Act and the ADA.
 
 
 3
 The undisputed facts of the case and the parties' allegations have been admirably summarized by the district court, and need no reformulation: AIDS/HIV
 
 
 4
 HIV, the virus that causes AIDS, attacks the immune system and leaves the body unable to ward off infection and disease. People with HIV develop numerous illnesses and physical conditions not found in the general population and experience manifestations of common illnesses that are much more aggressive, recurrent, and difficult to treat. Infections and cancers spread more rapidly in a person whose immune system is compromised, and the effectiveness of medicine is reduced by nutritional problems that limit the body's ability to absorb what is ingested.
 
 
 5
 The opportunistic infections and chronic conditions that result from a weakened immune system limit the HIV-infected person's ability to engage in many common activities of daily living, such as standing and walking. Individuals with HIV or AIDS have difficulties obtaining adequate nutrition. Illness and infection often limit appetite and the body's ability to absorb nutrients. Common HIV-related conditions such as nausea and oral thrush can limit an individual's ability to swallow and eat properly. Due to HIV-related diseases, many HIV-infected people have dietary restrictions.
 
 
 6
 Many of the drugs regularly prescribed to combat HIV, AIDS and related conditions have side effects that also cause functional limitations. Some of these side effects include anemia, severe nausea, diarrhea, abdominal pain, pancreatitis and muscle wasting. An individual taking these medications will likely be restricted in his ability to walk, stand, or travel. Many of the drugs must be taken several times a day, some on an empty stomach and some with food. Apart from this daily regimen, the medications frequently require refrigeration.
 
 DASIS
 
 7
 In 1985, New York City ("the City") established DASIS to assist individuals with advanced HIV-related disease or AIDS to access public benefits and services provided by HRA. On June 25, 1997, the New York City Council codified the existence of DASIS and delineated certain benefits and services for indigent New Yorkers with clinical/symptomatic HIV illness and AIDS. See N.Y. City Admin. Code §§ 21-126 to 21-128 (1997) (the "DASIS Law"). One of the benefits provided by the DASIS Law is "medically appropriate transitional and permanent housing" to "every eligible person with clinical/symptomatic HIV illness or with AIDS who requests assistance." DASIS Law § 21-128(b).
 
 
 8
 Homeless, single adult City residents who do not qualify for DASIS benefits are housed in congregate shelters, while DASIS clients are placed in either transitional supported housing or commercial single room occupancy hotels ("SROs"). Since transitional supported housing offers more structure and services, DASIS initially attempts to place its clients there. If transitional supported housing is unavailable, then DASIS clients are placed in an SRO run by the Department of Homeless Services' Emergency Assistance Unit ("EAU").
 
 
 9
 Under the DASIS Law, emergency housing provided to DASIS clients must be "suitable for persons with severely compromised immune systems" and "shall include, but not be limited to, individual refrigerated food and medicine storage and adequate bathroom facilities which shall, at a minimum, provide an effective locking mechanism and any other such measures as are necessary to ensure privacy." DASIS Law § 21-128(a)(4).
 
 
 10
 Plaintiffs claim that the SROs fail to meet DASIS Law standards and are uninhabitable. For example, plaintiff Zonell Wright was housed in the 12 Towns YMCA SRO in Brooklyn, New York. Although Wright had been prescribed AIDS medication that had to be taken with food, he did not have a refrigerator in his room. As a consequence, Wright paid a friend to store food in his refrigerator and to cook it in his kitchen. When Wright was transferred to emergency housing in Manhattan, he asked his doctor to prescribe him a medication that did not need to be taken with food because he could not store food in his room.
 
 
 11
 Two months later, DASIS placed Wright in the Allerton Hotel (the "Allerton"), an EAU SRO. Wright describes the Allerton as a rodent and cockroach-infested abode with no ventilation and a filthy bed. Once again, there was no refrigerator in the room. Wright's bathroom served sixteen rooms, some with more than one resident. It, too, was filthy.
 
 
 12
 After seven days in the Allerton, Wright was transferred to a YMCA, where he currently resides. The YMCA does not permit residents to have refrigerators. Like the other two SROs in which Wright was housed, the YMCA is dirty and rodent infested. He shares a bathroom with forty other people that is cleaned once a day and lacks basic amenities, including toilet seat covers and soap.
 
 
 13
 The other named plaintiffs in this action describe similar living conditions at their SROs. In addition, plaintiff Simon Vargas describes how one unnamed DASIS client with prosthetic legs was forced to walk up five flights of stairs to his room because the SRO did not have an elevator. In contrast to Wright, the other plaintiffs stayed in the emergency housing to which they were assigned.
 
 
 14
 Wright et al. v. Giuliani, No. 99 Civ. 10091, 2000 WL 777940, at *1-*3 (S.D.N.Y. June 14, 2000).
 
 
 15
 Plaintiffs commenced this action on September 29, 1999, seeking, in relevant part, a preliminary injunction compelling defendants: (i) to ensure that each DASIS client is provided with a functioning refrigerator, an individual locking mechanism on the bathroom, a clean mattress in good repair, clean linens in good repair at least weekly, a sufficient supply of toilet paper, a bathroom cleaned at least twice a day, and permission to store and consume food and drink in their rooms; (ii) to maintain security to prohibit illegal activities in the common areas of emergency housing; and (iii) to design and implement sensitivity training for all personnel working in the emergency housing.
 
 
 16
 The district court denied plaintiffs' request for preliminary injunctive relief. The court began its discussion by reciting the rigorous standard that plaintiffs must satisfy for a preliminary injunction in this case: a "clear" or "substantial" likelihood of success on the merits.
 
 
 17
 The court ruled that plaintiffs could not establish a likelihood of success on the basis of what it found to be an incomplete record. The court determined that it could not decide whether the emergency housing that DASIS clients receive is "adequate" without comparing it to the quality of the emergency housing the City provides to the able-bodied, a comparison that plaintiffs argue is irrelevant.
 
 
 18
 The district court construed Circuit precedent to require that in any Rehabilitation Act or ADA analysis, "courts must focus on the specific services provided to the able-bodied and compare them to the services provided to the disabled." The court emphasized that the Rehabilitation Act and the ADA guarantee no specific benefits; they require only that "the particular benefits provided to the able-bodied be meaningfully accessible to the disabled," and therefore, "the relevant question is not the amorphous concept of emergency housing, but whether plaintiffs have access to the particular emergency housing granted to able-bodied, homeless New York City residents." The court concluded that on the present state of the record, plaintiffs could not demonstrate that they lacked "meaningful access" to emergency housing.
 
 
 19
 On September 19, 2000, Judge Sterling Johnson of the United States District Court for the Eastern District of New York issued a memorandum and order in Henrietta D. v. Giuliani, 95 Civ. 0641 (E.D.N.Y. Sept. 19, 2000), a case in which six homeless individuals with AIDS or HIV brought suit against the City of New York to challenge various aspects of the DASIS program. Judge Johnson ruled in favor of the plaintiffs, granting declaratory relief and a permanent injunction, and ordering a federal magistrate to oversee DASIS for the next three years to assure compliance with his findings of numerous violations of the law (including, apparently, ADA and Rehabilitation Act violations). See generally id. Although the relief granted in Henrietta D. may remedy the conditions complained of here, Judge Johnson's order does not purport to grant the precise relief sought by the plaintiffs in this case. We therefore conclude that this appeal is not moot.
 
 DISCUSSION
 
 20
 We review the district court's denial of a preliminary injunction for abuse of discretion, see SG Cowan Securities Corp. v. Messih, No. 00-7601, 224 F.3d 79, 81 (2d Cir. Aug. 18, 2000), and we are "free to affirm an appealed decision on any ground [that] finds support in the record." Beal v. Stern, 184 F.3d 117, 122 (2d Cir. 1999).
 
 
 21
 Ordinarily, a preliminary injunction may be granted when the party seeking the injunction establishes that "1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Otokoyama Co. Ltd. v. Wine of Japan Import, Inc., 175 F.3d 266, 270 (2d Cir. 1999). But when, as here, the moving party seeks a preliminary injunction that will affect "government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." Beal, 184 F.3d at 122 (internal quotations omitted). And, when the injunction sought "will alter rather than maintain the status quo" the movant must show "clear" or "substantial" likelihood of success. Rodriquez v. Debuono, 175 F.3d 227, 233 (2d Cir. 1999) (internal citations and quotations omitted).
 
 
 22
 In this case, there is an insufficient record for us to conclude that the district court abused its discretion by denying plaintiffs' request for preliminary injunctive relief. Conceptually, the issue on this appeal appears to be whether the DASIS program, if administered in accordance with the relief plaintiffs seek, is to be viewed (i) as a "reasonable accommodation" to afford the plaintiffs "meaningful access" to the City's emergency housing program, or (ii) as a separate program conceived and implemented to provide additional substantive benefits to certain disabled persons such as the plaintiffs.
 
 
 23
 This distinction--between affording (i) "meaningful access" through "reasonable accommodation" and (ii) "additional substantive benefits"--is crucial to the merits of this case under Supreme Court and Second Circuit authority. In Alexander v. Choate, 469 U.S. 287 (1985), the Supreme Court considered whether the Rehabilitation Act was violated by Tennessee's proposed reduction in the number of inpatient hospital days per year for which state Medicaid would reimburse hospitals on behalf of each recipient. The plaintiffs in that case argued that the reduction was discriminatory because it would have a disproportionate effect on disabled, lower-income Medicaid recipients, such as themselves.
 
 
 24
 The Supreme Court disagreed. The Court noted first that in a previous decision it had:
 
 
 25
 [S]truck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable ones."
 
 
 26
 Id. at 300 (citing Community College v. Davis, 442 U.S. 397, 412-13 (1979)). Applying this distinction, the Court rejected plaintiffs' argument that the Rehabilitation Act guarantees the handicapped "equal results" from government initiatives:
 
 
 27
 To the extent [plaintiffs] further suggest that their greater need for prolonged inpatient care means that, to provide meaningful access to Medicaid services, Tennessee must single out the handicapped for more than 14 days of coverage, that suggestion is simply unsound. At base, such a suggestion must rest on the notion that the benefit provided through state Medicaid programs is the amorphous objective of "adequate health care."
 
 
 28
 Id. at 302-03 (emphasis added).
 
 
 29
 In a string of recent decisions brought under the disabilities statutes at issue here, this Circuit has also distinguished between (i) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits. See, e.g., Rodriquez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999) (rejecting ADA challenge based on New York City's failure to provide safety monitoring devices to a subset of individuals with disabilities because "[t]he ADA requires only that a particular service provided to some not be denied to disabled people"); Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998) (rejecting Rehabilitation Act claim by disabled individual who sought, inter alia, a "job coach," because "what [plaintiff] seeks to challenge is not illegal discrimination against the disabled, but the substance of the services provided to him"); Lincoln CERCPAC v. Health and Hospitals Corp., 147 F.3d 165, 168 (2d Cir. 1998) (affirming dismissal of Rehabilitation Act and ADA claims brought by disabled children who were transferred from one rehabilitation center to another with fewer services because "the disabilities statutes do not guarantee any particular level of medical care for disabled persons, nor [do they] assure maintenance of service previously provided"). The thrust of these cases is that the disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make "reasonable accommodations" to enable "meaningful access" to such services as may be provided, whether such services are adequate or not.
 
 
 30
 Plaintiffs argue that the Rodriquez line of cases is inapposite because in this case they seek only meaningful access to a benefit that is already provided to the non-disabled, and that plaintiffs characterize as "emergency housing." They may be right, and the district court did not conclusively rule otherwise. But the present record evidently did not afford the district court enough information to determine that there was "clear" or "substantial" evidence that the remedial measures plaintiffs sought were "reasonable accommodations" rather than additional, substantive benefits. We see no error in that ruling.
 
 
 31
 Conceivably, a more complete record will assist the district court in classifying and evaluating plaintiffs' claims, and in making findings that decide the open questions. In Alexander, the Supreme Court held that "adequate health care" was too "amorphous" a concept to define the government service or benefit to which disabled persons may assert a statutory right of access and accommodation. Alexander, 469 U.S. at 303. Evidence concerning the condition of congregate housing for the able-bodied may assist the court to determine whether the concept of "adequate emergency housing" is amorphous in the sense that "adequate health care" was held to be amorphous in Alexander.[1] Alexander, 469 U.S. at 303.
 
 
 32
 Plaintiffs also argue that the district court's ruling is fundamentally flawed because it impliedly holds that a claim under the disabilities statutes cannot prevail without a showing of "disparate treatment" between the disabled and the non-disabled. The district court concluded that the record should be supplemented with "information about the City's emergency housing for able-bodied homeless residents" in order to ascertain what specific services the City provides to its homeless residents. Such supplementation of the record would assist a disparate treatment analysis, but we need not decide whether that analysis is helpful, because the same supplementation of the record may cast light on whether the remedial relief plaintiffs seek would effect a "fundamental" or "substantial" change in the DASIS program, a question that bears upon the merits.[2]
 
 CONCLUSION
 
 33
 The district court did not abuse its discretion in denying plaintiffs' motion for a preliminary injunction. The district court's order is affirmed.
 
 
 
 NOTES:
 
 
 [1]
 There can be no suggestion that the district court has predetermined plaintiffs' merits case: It rejected defendants' argument that plaintiffs failed to state a claim under the disabilities statutes because they seek only "new benefits" by "declin[ing] to read [plaintiffs'] complaint so narrowly."
 
 
 [2]
 Counsel for the City of New York stated during oral argument in this Court that discovery is ongoing in the district court, and that the City's response to plaintiffs' first request for documents and interrogatories was due on October 13, 2000.