**AMERICAN FINANCIAL SERVICES ASSOCIATION, Plaintiff,**

v.

**John P. BURKE, Banking Commissioner of the State of Connecticut, in his official capacity, Defendant.**

**No. 3:01CV1690(CFD).**

United States District Court, D. Connecticut.

Oct. 5, 2001.

Eric J. Mogilnicki, David W. Ogden, Trevor W. Morrison, Joel A. Nichols, Wilmer, Cutler & Pickering, Washington, DC, James Sicilian, Donald J. Marchesseault,

Day, Berry & Howard, Hartford, CT, for plaintiff.

John G. Haines, Attorney General's Office, Hartford, CT, for defendant.

## RULING ON PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

DRONEY, District Judge.

Plaintiff American Financial Services Association ("AFSA") brought this action against Defendant John P. Burke, Banking Commissioner of the State of Connecticut, seeking declaratory and injunctive relief from section 5(7) of the Connecticut Abusive Home Loan Lending Practices Act, P.A. No. 01–34 (S.H.B.6131), 2001 Conn. Legis. Serv. 01–34 (West) ("Connecticut Act"), on the ground that it is inconsistent with section 2 of the Federal Arbitration Act, 9 U.S.C. § 2 ("FAA"), and thus preempted under the Supremacy Clause. U.S. Const. art. VI, cl. 2. The Connecticut Act took effect on October 1, 2001. *See* Conn. Gen.Stat. § 2–32 ("All public acts, except when otherwise therein specified, shall take effect on the first day of October following the session of the general assembly at which they are passed."). AFSA has filed an application for a preliminary injunction prohibiting defendant Banking Commissioner from enforcing section 5(7) of the Act against AFSA and its members. For the reasons stated below, the Court grants AFSA's application for a preliminary injunction.

### FINDINGS OF FACT

Based on the stipulated fact, affidavits, and declarations submitted by AFSA, and the testimony of William Nahas, Jr., Director of the Consumer Credit Division of the Department of Banking of the State of Connecticut,[1] the Court makes the following findings of fact:

1. Plaintiff American Financial Services Association is a non-profit trade association incorporated in the District of Columbia. AFSA represents about 360 entities engaged in broad-based consumer lending services, including home mortgages.

2. American General Finance, Inc. ("American General"), CitiFinancial, Inc. ("CitiFinancial"), Household Realty Corp. ("Household"), and Wells Fargo Financial, Inc. ("Wells Fargo") are all members of AFSA. All of those companies were incorporated and have their principal places of business in states outside the State of Connecticut.

3. AFSA's members are engaged in a broad range of interstate commercial activities.

4. The Connecticut Act contains a number of provisions relating to loans it defines as "high cost home loan[s]." Section 3(4) of the Act defines a "high cost home loan" as any loan or extension of credit (except a "reverse mortgage transaction"):

(A) In which the borrower is a natural person;

(B) The proceeds of which are to be used primarily for personal, family, or household purposes;

(C) In which the loan is secured by a mortgage upon any interest in one-to-four family residential real property located in [Connecticut] which is, or, when the loan is made, is intended to be occupied by the borrower as a principal residence; and

---

1. The Court has also considered the two Prepared Statements of the Federal Trade Commission and the *American Banker* article, marked Exhibits A, B, and C to Defendant's Memorandum of Law in Opposition to Plaintiff's Application for Preliminary Injunction.

(D) In which the APR at consummation will exceed the yield on [United States Department of] Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the loan or extension of credit is received by the lender, by more than the number of percentage points specified in 12 C.F.R. 226.32(a)(1)(i), as from time to time amended.

At present, the percentage specified in 12 C.F.R. § 226.32(a)(1)(i) is ten percent. Thus, the Act presently covers loans with APRs greater than ten percentage points above the rate for securities issued by the United States Treasury Department with comparable periods of maturity. (Loans fitting this definition, whether entered into before, on, or after October 1, 2001, are referred to herein as "high cost home loans.")

5. CitiFinancial has in the past extended loans that would have qualified as "high cost home loans" under the Act if the Act had been in effect at the time the loans were made. American General, CitiFinancial, Household, and Wells Fargo also extend a substantial number of home loans that would constitute "high cost home loans" under the Connecticut Act.

6. Many of the "high cost home loans" extended by AFSA members are funded wholly or in part by investment sources from outside the State of Connecticut. AFSA members often resell such loans to secondary lenders in a national market for mortgage agreements. The loan documents for many of those loans are prepared outside the State of Connecticut, and many of the loans are processed outside the State of Connecticut.

7. When extending "high cost home loans," AFSA members use standard form contracts that include mandatory arbitration clauses. Such clauses typically require that any dispute arising under the agreement be resolved through binding individual arbitration between the parties, unless both parties subsequently agree to forgo arbitration.

8. The inclusion of mandatory arbitration clauses in AFSA members' "high cost home loan" agreements decreases the cost to them of providing such loans.

9. Section 5(7) of the Connecticut Act provides that "[a] high cost home loan shall not provide for or include .... [a] mandatory arbitration clause or a waiver of participation in a class action." The Act authorizes defendant Banking Commissioner to impose civil penalties of up to $15,000 per violation on lenders that he determines have violated section 5(7) of the Act. *See* Connecticut Act § 10; *see generally* Conn. Gen.Stat. § 36a–50.

10. Defendant Banking Commissioner intends to enforce section 5(7) of the Act in a manner consistent with its text. Defendant Banking Commissioner has defined section 5(7) as prohibiting "mandatory arbitration with binding results." Neither party has identified any relevant ambiguity in the scope of section 5(7)'s prohibitions, and neither party denies that section 5(7) would apply to bar the kinds of mandatory arbitration clauses that AFSA members have included in their "high cost home loan" agreements in the past.

11. AFSA members intend to comply with the law. Thus, in the absence of a ruling from this Court enjoining enforcement against them of section 5(7) of the Connecticut Act, the "high cost home loan" agreements that AFSA members enter into on or after October 1, 2001 will not provide for mandatory arbitration.

12. After October 1, 2001, AFSA members wishing to provide "high cost home loans" will lose the opportunity to include

mandatory arbitration clauses in the agreements for those loans. AFSA members will not later have any right to reform the "high cost home loan" agreements they enter into on or after October 1, 2001, even if AFSA ultimately prevails in this suit.

13. By entering into "high cost home loan" agreements lacking mandatory arbitration clauses, or if neither party has a right to mandatory arbitration so long as section 5(7) remains in full force and effect, AFSA members will be subject to the litigation of disputes arising under those agreements. Such litigation is more expensive than arbitration for AFSA members and is likely to increase the cost to AFSA members of extending "high cost home loans." Because AFSA members will not have the right under their "high cost home loan" agreements to arbitrate such disputes, they will lose the ability to protect themselves against exposure to such increased costs.

14. Because resolving disputes arising out of "high cost home loan" agreements by litigation rather than by arbitration will increase the costs of those loans to AFSA members, some AFSA members may decrease their subprime lending activities in Connecticut if section 5(7) of the Connecticut Act remains in effect.

15. After October 1, 2001, AFSA members wishing to provide "high cost home loans" will, pursuant to the law, modify their standard form loan contracts, distribute those revised contracts, and train their employees and agents about their revised contracts.

16. If the Court issues the preliminary injunctive relief requested by AFSA in this litigation, AFSA members will continue to use mandatory arbitration clauses in their "high cost home loan" agreements.

## DISCUSSION

Preliminary injunctive relief is appropriate where the movant has shown:

> (i) that it is likely to suffer irreparable injury if the injunction is not granted, and (ii) either (a) a likelihood of success on the merits of its claim or (b) the existence of serious questions going to the merits of its claim and a balance of the hardships tipping decidedly in its favor.

*Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999). The "likelihood of success" standard applies where, as here, the movant "seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989); *see Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000). Also, where a request for a preliminary injunction "implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable of New York City v. Bloomberg, L.P.*, 118 F.3d 917, 929 (2d Cir.1997).

## I. *Likelihood of Success on the Merits*

### A. *Procedural Issues*

■ AFSA has established that it is likely to succeed on the merits of its complaint. First, this Court has federal question jurisdiction over AFSA's suit under 28 U.S.C. § 1331. As the United States Supreme Court has explained, "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause, must prevail, . . . presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.

14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *see also Concerned Citizens of Cohocton Valley, Inc. v. New York State Dep't of Envtl. Conservation,* 127 F.3d 201, 206 (2d Cir.1997). AFSA's suit fits this description: it seeks injunctive relief from this Court from the application to AFSA's members of section 5(7) of the Connecticut Act, on the ground that section 5(7) is preempted by section 2 of the FAA and is therefore invalid and unenforceable pursuant to the Supremacy Clause. *See Saturn Distrib. Corp. v. Williams,* 905 F.2d 719 (4th Cir.1990), *cert. denied,* 498 U.S. 983, 111 S.Ct. 516, 112 L.Ed.2d 527 (1990); *Securities Indus. Ass'n v. Connolly,* 883 F.2d 1114 (1st Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990).

■ The Second Circuit's decision in *Fleet Bank, Nat'l Ass'n v. Burke* does not control the instant case. 160 F.3d 883, 890–93 (2d Cir.1998). There, the Second Circuit held that the *Shaw* exception to the well-pleaded complaint rule [2] does not apply where plaintiffs seeking injunctive relief raise "disputes about the meaning and application of" the state law they argue is preempted. *Fleet,* 160 F.3d at 892. Concluding that such application "would risk[ ] a major and unwarranted incursion on the authority of state courts to construe state statutes," the court held that the exception only applied "where the plaintiff, seeking an injunction on the ground of preemption, does not dispute the meaning and application of state law." *See id.* at 892–93. In the instant case, AFSA does not dispute the meaning of the Act and does not claim that section 5(7) of the Act does not apply to its members engaged in extending "high cost home loans." Thus, no construction of Connecticut law is needed, and the

Court has jurisdiction to hear AFSA's claim.

■ AFSA also has standing to bring the instant action. An organization has standing to assert claims on behalf of its members where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see In re Holocaust Victim Assets Litig.,* 225 F.3d 191, 196 (2d Cir.2000). AFSA's action here satisfies all of these requirements. In particular, AFSA's members would have standing to bring this anticipatory challenge to section 5(7) of the Connecticut Act in their own right, because they have an "actual and well-founded fear that [section 5(7) ] will be enforced against them." *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *see Town of Springfield v. McCarren,* 549 F.Supp. 1134, 1144 (D.Vt.1982), *aff'd,* 722 F.2d 728 (2d Cir.), *cert. denied,* 464 U.S. 942, 104 S.Ct. 360, 78 L.Ed.2d 322 (1983) ("Parties who object to state statutes ... on Supremacy Clause ... grounds frequently prefer to bring anticipatory challenges ... rather than await the opportunity to make their defense in state enforcement actions in which they face the danger of punishment should their objections turn out to be ill-founded."). Defendant has stated that the Anti–Arbitration Provision prohibits arbitration clauses providing for "mandatory arbitration with binding results," and AFSA's members have included that precise kind

---

**2.** The "well-pleaded complaint rule" bars a plaintiff from invoking federal question jurisdiction merely to anticipate a federal defense.

*See Fleet,* 160 F.3d at 886. This includes the defense of preemption. *See id.*

of arbitration clause in their "high cost home loan" agreements. They would continue to do so if section 5(7) were enjoined.

### B. The Merits

█ AFSA is likely to prevail on its assertion that section 5(7) of the Connecticut Act is preempted because it conflicts with section 2 of the FAA. Section 2 of the FAA provides, in pertinent part:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2001). The "high cost home loan" agreements extended by AFSA members at issue here are contracts "evidencing ... transaction[s] involving commerce" within the meaning of section 2 of the FAA. AFSA members are multistate commercial concerns with headquarters outside the State of Connecticut, some of the loan documents at issue are prepared outside the State of Connecticut, some of the loans are processed outside the State of Connecticut, many of the loans are funded wholly or in part by investment sources from outside Connecticut, and the loans are often resold to secondary lenders in a national market for mortgage agreements. *See generally Allied–Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 282, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S.

232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

█ State law conflicting with section 2 of the FAA is, pursuant to the Supremacy Clause,[3] preempted and unenforceable. *See Volt*, 489 U.S. at 477, 109 S.Ct. 1248 (holding that the FAA preempts any state law "to the extent that [the state law] 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " in passing the FAA) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)); *Perry*, 482 U.S. at 491, 107 S.Ct. 2520 (holding that because a state law was in "unmistakable conflict" with section 2 of the FAA and its underlying policy, "under the Supremacy Clause, the state statute must give way"); *see generally Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) ("[U]nder the Supremacy Clause, ... any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.") (internal quotation and citations omitted).

Section 2 of the FAA "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements." *Southland*, 465 U.S. at 16, 104 S.Ct. 852; *see id.* at 13, 104 S.Ct. 852 ("[T]he purpose of the [FAA] was to assure those who desired arbitration and whose contracts related to interstate commerce that their expectations would not be undermined by ... state courts or legislatures.") (internal quotation and citation omitted). In passing section 2 of the FAA, Congress "with-

---

**3.** The Supremacy Clause provides:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S. Const. art. VI, cl. 2.

drew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration," *id.* at 10, 104 S.Ct. 852, and "precluded States from singling out arbitration provisions for suspect status," *Casarotto,* 517 U.S. at 687, 116 S.Ct. 1652.

Accordingly, the Supreme Court and the Courts of Appeals have consistently held that section 2 of the FAA preempts state laws that render arbitration clauses in certain contracts invalid and unenforceable. In *Southland,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1, the Supreme Court struck down a California statute banning arbitration under franchise agreements; in *Perry,* 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426, the Supreme Court struck down a California statute banning arbitration in actions for the collection of wages; in *Saturn,* 905 F.2d 719, the Fourth Circuit struck down a Virginia statute restricting arbitration in automobile dealership agreements; and in *Securities Indus.,* 883 F.2d 1114, the First Circuit struck down Massachusetts regulations restricting the use of mandatory arbitration in the securities industry.

Section 5(7) of the Connecticut Act conflicts with section 2 of the FAA by declaring mandatory arbitration clauses in "high cost home loan" agreements to be unlawful, and hence invalid and unenforceable, and by prohibiting the formation of mandatory arbitration clauses in such agreements. This invalidation of contracting parties' agreements to arbitrate conflicts with the FAA's purpose of ensuring that agreements to arbitrate are "rigorously enforced." *Perry,* 482 U.S. at 490, 107 S.Ct. 2520 (quotation omitted); *see Casarotto,* 517 U.S. at 688, 116 S.Ct. 1652 (The purposes of the FAA are "antithetical to threshold limitations placed specifically and solely on arbitration provisions.");

*Southland,* 465 U.S. at 16, 104 S.Ct. 852 (The FAA "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements."); *see also Saturn,* 905 F.2d at 726 ("The FAA does not permit a state to single out arbitration agreements in standardized contracts and, in effect, declare their very formation to be unconscionable."). Moreover, the conflict with the FAA is compounded by the Connecticut Act's authorization of civil penalties on lenders who exercise their right under the FAA to include mandatory arbitration clauses in their loan agreements, thus burdening and undermining the exercise of that right. *See Southland,* 465 U.S. at 13, 104 S.Ct. 852 (explaining that section 2 of the FAA is aimed at "assur[ing] those who desired arbitration and whose contracts related to interstate commerce that their expectations would not be undermined by ... state courts or legislatures").

For these reasons, the Court finds that AFSA is likely to prevail on the merits of its claim.

## II. *Likelihood of Suffering Irreparable Harm*

To satisfy the irreparable harm requirement, a movant generally must show that it is "likely to suffer irreparable injury if the injunction is not granted," *Beal,* 184 F.3d at 122, and that the harm is "not remote and speculative" but rather "actual and imminent." *State of New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 755 (2d Cir.1977). Harm—including pecuniary harm—is irreparable where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir. 1999).

AFSA members are likely to suffer irreparable harm if the requested preliminary injunction is not issued. As an initial matter, in the absence of a preliminary injunction, AFSA members will either forgo making "high cost home loans," or make such loans with contracts lacking mandatory arbitration clauses. No later relief can reform the contracts that AFSA members entered into without mandatory arbitration clauses or restore to AFSA members the negotiating position they would have occupied had section 5(7) not been in effect. *See Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir.1996) (holding that irreparable injury would result from the loss of incumbent local telephone service providers' right to negotiate with state commissions free from the influence of an FCC pricing rule that was arguably illegal; if the rule was later struck down, subsequent negotiations would not be able to "recreate the atmosphere of free negotiations that would have existed in the absence of" the FCC rule). Such harm is irreparable because, "upon final resolution of the action [AFSA's members] cannot be returned to the positions they previously occupied." *Brenntag*, 175 F.3d at 249.

██ Additionally, AFSA's members are likely to suffer pecuniary harms if a preliminary injunction is not issued. Where pecuniary losses cannot later be recovered because the defendant enjoys Eleventh Amendment immunity (as the State of Connecticut does here), such losses are irreparable for purposes of preliminary injunctive relief. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir.1983) (per curiam), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984); *Blum v. Schlegel*, 830 F.Supp. 712, 725 (W.D.N.Y. 1993) ("[T]he Second Circuit has determined that in cases where the defendant is protected by the Eleventh Amendment

which thus renders the plaintiff unable to recover monetary damages, the injury will be irreparable."), *aff'd*, 18 F.3d 1005 (2d Cir.1994).

If a preliminary injunction is not issued, AFSA members wishing to continue extending "high cost home loans" on or after October 1, 2001 will have to enter into loan agreements lacking mandatory arbitration clauses and will be bound to those contracts for the life of the loans. It is well established that litigation is a more costly method of dispute resolution than arbitration, *see* S.Rep. No. 68–536, at 3 (1924); H.R.Rep. No. 97–542, at 13 (1982), *reprinted in* 1982 U.S.C.C.A.N. 765, and AFSA's members have confirmed that this is the case for them.

AFSA members wishing to extend home loans subject to the Connecticut Act will be unable to protect themselves from the exposure to such increased costs by including arbitration clauses in those contracts. Moreover, because mortgage loans may have terms of as long as thirty years, it is likely that AFSA members eventually will be forced to resolve some disputes under those agreements by litigation rather than arbitration. Thus, AFSA members will incur litigation costs that they could have avoided had they been permitted to include mandatory arbitration clauses in the contracts at issue. Because such costs cannot be recovered from Connecticut, incurring them constitutes irreparable harm. *See Securities Indus. Ass'n v. Connolly*, 703 F.Supp. 146, 157 (D.Mass.1988) (noting that "the costs of dispute resolution itself will increase" if arbitration clauses are prohibited, and holding that such increased costs constitute irreparable harm), *aff'd*, 883 F.2d 1114 (1st Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990).

AFSA members are also likely to suffer irreparable harm in the form of forgone

business. The increased cost of resolving disputes by litigation rather than arbitration will increase the cost to AFSA members of extending "high cost home loans," and those increased costs may force them to decrease their lending business. The lost revenue from such forgone business cannot be compensated after it is lost. *See United States v. New York,* 708 F.2d at 93.

## III. *The Balance of Public Policy Interests*

In cases where an application for a preliminary injunction implicates public interests, "a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable,* 118 F.3d at 929. "[I]n some litigation against the government, 'no party has an exclusive claim on the public interest,'" *id.* at 923 (quoting *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326, 1339 (2d Cir.1992)), and a preliminary injunction may issue where "[t]here are public interest concerns on both sides of the pending controversy." *Id.* at 929.

In this case, AFSA invokes a federal statute that, as the Supreme Court has described, "declar[es] ... a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see Southland,* 465 U.S. at 10, 104 S.Ct. 852 ("In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."). In so doing Congress had "the needs of consumers, as well as others, in mind" in making its determination. *Allied–Bruce,* 513 U.S. at 280, 115 S.Ct. 834; *see Time Warner Cable,* 118 F.3d at 929 (affirming the district court's grant of a preliminary injunction on the ground that the movant's interests were consistent with the interests Congress sought to protect in the federal statute at issue).

It may very well be that arbitration of disputes should not be a required term in consumer contracts such as "high cost home loan" agreements, but until Congress acts to remove the blanket endorsement of arbitration agreements by the FAA, a state may not restrict the validity or enforceability of such arbitration agreements. Thus, while the efforts of the Connecticut legislature to curb "predatory lending" practices through banning mandatory arbitration clauses in "high cost home loans" may be admirable and important, until Congress limits the enforceablility of arbitration clauses in certain contexts, the Court must follow the FAA's broad mandate providing for the enforcement of such clauses.

### CONCLUSION

For the foregoing reasons, the Court finds that the plaintiff is entitled to the requested preliminary injunction. The Court grants that relief by the following Order:

It is hereby ORDERED that until further notice or order of the Court, the following preliminary relief shall issue:

Defendant John P. Burke, his employees, agents, and successors, and all others acting in concert or participation with him or on his behalf, are enjoined from enforcing or threatening to enforce section 5(7) of the Connecticut Abusive Home Loan Lending Practices Act, P.A. No. 01–34 (S.H.B.6131), 2001 Conn. Legis. Serv. 01–34 (West), against the plaintiff and its

members with respect to "high cost home loan[s]," as defined in that Act, that contain arbitration clauses.