**TANG CAPITAL PARTNERS, LP, Plaintiff,**

v.

**CELL THERAPEUTICS, INC., Defendant.**

No. 08 Civ. 0017(CM)(DCF).

United States District Court, S.D. New York.

Dec. 17, 2008.

———

Celia Goldwag Barenholtz, Shannon Suzanne McKinnon, Cooley Godward Kronish LLP, New York, NY, Philip C. Tencer, Ryan E. Blair, Cooley Godward Kronish L.L.P., San Diego, CA, for Plaintiff.

Daniel J. Dunne, Patryk J. Chudy, Orrick, Herrington & Sutcliffe LLP, New York, NY, Eric M. Creizman, Heller Ehrman, Joshua Bacon Selig, Heller Ehrman, LLP, New York, NY, for Defendant.

## DECISION AND ORDER DENYING DEFENDANT'S SUGGESTION THAT THE COURT LACKS JURISDICTION TO ENTERTAIN PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION, DECLINING TO ENTER A TEMPORARY RESTRAINING ORDER, AND DIRECTING A HEARING ON PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION AND ON THE ISSUE OF JURY TRIAL WAIVER

McMAHON, District Judge:

### Introduction

On December 10, 2008, plaintiff Tang Capital Partners, LP ("Tang Capital") filed an application for a temporary restraining order ("TRO") under Federal Rule of Civil Procedure 65 against defendant Cell Therapeutics, Inc. ("CTI"). Tang Capital's request for a TRO is connected to the present litigation before this Court—based on Diversity—on a breach of contract claim.

Plaintiff's application requests that CTI be enjoined from "committing yet another breach of the parties' stock purchase contract ... [by] acquiring certain outstanding convertible debt by way of a Dutch Auction." (Pl. Application for a TRO at 1.) Tang Capital asserts that a TRO is warranted because "CTI's conduct will result in immediate and irreparable injury, losses and damage to Tang Capital. If CTI is permitted to complete its newly-proposed transaction, CTI, which has never been profitable, will lack sufficient capital to pay Tang Capital under the redemption procedure of the parties' contract." (*Id.*)

CTI submitted a brief written response to Tang Capital's application the following day, December 11th, and the Court held an immediate hearing with all parties at which we discussed the TRO and CTI's suggestion that the court lacked jurisdiction to entertain the application for injunctive relief. After hearing arguments from both sides, this Court asked the parties to submit supplemental briefs on two issues: whether this Court has the jurisdiction to entertain an application for a TRO in this case in light of the Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999); and whether Tang Capital had waived the waiver of jury trial to which the parties agreed in their contract by demanding a jury trial in its complaint against CTI.

I conclude that the Court has jurisdiction to entertain plaintiff's application for a preliminary injunction. There is no need to enter a TRO at this time, because defendant has represented to the Court that the proposed transaction being challenged by plaintiff will not be consummated until January 12 at the earliest, and the parties have already been ordered to appear at a hearing on plaintiff's motion for a preliminary injunction on January 6, 2009. At that hearing, I will also take evidence on whether, by demanding a jury trial, plaintiff "waived the waiver" of jury trial that is a term of the contract between the parties.

## Background

Tang Capital is a Delaware limited partnership and registered investment fund; its headquarters are in San Diego, California. Tang Capital invests in public and private health care and biotechnology companies through private placements. It also regularly purchases equity or debt securities on the open market.

Kevin Tang ("Tang") is the managing director of Tang Capital Management, LLC, which is the general partner of Tang Capital. Tang is responsible for all of the investment decisions made by Tang Capital.

CTI is a Washington corporation with its headquarters in Seattle. CTI is a biotechnology company that develops cancer therapies. It became a public company in 1997.

The principal founder of CTI is Dr. James Bianco ("Dr. Bianco"). He is the corporation's chief executive officer and serves as a director.

In or about April 2007, Tang Capital purchased 3,000 shares of CTI's Series B Preferred Stock (hereinafter, "the Stock") for $3 million. In order to purchase the Stock, a purchaser needed to execute a Series B Purchase Agreement (hereinafter, "Purchase Agreement") and Articles of Amendment to Amended and Restated Articles of Incorporation (hereinafter, "Restated Articles") (collectively, the "Transaction Documents"). The purchase of the Stock pursuant to the terms of the Transaction Documents forms the basis for Tang Capital's breach of contract claim and its application for a TRO.

For the purposes of this decision, the relevant provisions of the Restated Articles are: (1) the definition of "Common Stock Equivalent"; (2) the definition of "Triggering Redemption Amount"; (3) Section 9: "Redemption Upon Triggering Events"; and (4) Section 10: "Negative Covenants." The relevant provisions of the Purchase Agreement are: (1) "5.15: *Remedies*"; and (2) "5.9 *Governing Law*."

At the time the Transaction Documents were signed the term "Common Stock Equivalent" was defined as follows:

> any securities of the Corporation or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

(Tang Decl. Ex. A at CTI–TC0000441).

A "Triggering Event," for our purposes, is defined as the failure by CTI "to observe or perform any covenant, agreement or warranty contained in, or otherwise commit any breach of, the Transaction Documents . . . ." (*Id.* at CTI–TC0000456.) The specific contractual covenant at issue is:

> *Section 10. Negative Covenants.* So long as any shares of Series B Preferred Stock are outstanding, unless the holders of at least 67% in the Stated Value of the then outstanding shares of the Series B Preferred Stock shall have otherwise given prior written consent, the Corporation shall not, and shall not permit any of its subsidiaries (whether or not a Subsidiary on the Original Issue Date) to, directly or indirectly: . . .
> b) repay, repurchase or offer to repay, repurchase or otherwise acquire any shares of its Common Stock, Common

Stock Equivalents or Junior Securities . . . .

(*Id.* at CTI–TC0000457.)

If a "Triggering Event" occurred, a Holder of the Stock was entitled "to require the Corporation to redeem all of the Series B Preferred Stock then held by such Holder for a redemption price equal to the Triggering Redemption Amount." (*Id.* at CTI–TC0000457.) The "Triggering Redemption Amount" is

> for each share of Series B Preferred Stock, the sum of (i) the greater of (A) 130% of the Stated Value and (B) the product of (a) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (b) the Stated Value divided by the then Conversion Price, (ii) all accrued but unpaid dividends thereon and (iii) all liquidated damages and other costs, expenses or amounts due in respect of the Series B Preferred Stock.

(*Id.* at CTI–TC0000443–44.)

In the Purchase Agreement, the parties defined the scope of their rights and the applicable law. The parties' remedies provision states:

> In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agrees to waive and not assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

(Tang Decl. Ex. B at CTI–TC0000484.) The parties' agreement provides that the

internal laws of New York govern "the construction, validity, enforcement and interpretation of the Transaction Documents." (*Id.* at CTI–TC0000483). The contract also contains a waiver of trial by jury. (*Id.*)

In a complaint filed on December 19, 2007, Tang Capital alleged that CTI breached the parties' contract in or about December 2007, when it closed a transaction to restructure $55 million in outstanding notes without first obtaining written consent from 67% of the then outstanding Series B Preferred Shareholders. On or about November 26, 2007, CTI sent all holders of the Stock, including Tang, a request for written consent to authorize the debt restructuring. (Blair Decl. Ex. N ¶ 18. (hereinafter, "Stip.").) On or about December 11, 2007, Tang sent a letter to Dr. Bianco, declining to consent to the transaction and contending that the proposed debt restructuring would violate the Negative Covenants and constitute a Triggering Event. That same day, CTI filed an Articles of Correction to the Amended and Restated Articles of Incorporation of CTI, which "corrected" a purported "scrivener's error" by removing the word "debt" from the definition of "Common Stock Equivalents." (*Id.* ¶ 22.) On December 12, 2007, CTI closed the transaction without obtaining Tang's consent. The transaction involved "an exchange of common stock and warrants for outstanding convertible senior subordinated notes and convertible subordinated notes with maturity dates as of June 15, 2008." (*Id.* ¶¶ 20, 23.)

After the transaction closed, Tang made a demand for redemption of his 3,000 shares of the Stock for a price equal to 130% of the stated value. CTI refused,

and on or about December 19, 2007, Tang Capital filed its complaint for breach of contract against CTI in this Court. The parties have been litigating that case actively for the last year; only this week they completed briefing on plaintiff's motion for summary judgment.

On or about October 2008, CTI repurchased debt and warrants from BAM Opportunity Fund LP, again without first obtaining written consent from Tang Capital. At the time of the transaction, Tang held at least 57% of the then outstanding Series B preferred stock. Tang Capital claims that it would have applied to the Court for injunctive relief if it had prior knowledge of this October transaction.

On December 11, 2008, Tang Capital filed an application for a TRO, alleging that CTI proposed to breach the parties' contract yet again. In a December 5, 2008 press release, CTI announced that its Board of Directors had authorized a "Modified Dutch Auction" tender offer to purchase a portion or all of five series of Convertible Notes (hereinafter, the "Dutch Auction").[1] Plaintiff contends that, "The consummation of the Proposed Transaction would be a third transaction completed after litigation commenced that constitutes a breach of the parties' contract for which there will be insufficient funds to adequately compensate Tang Capital." (Pl. Application for a TRO at 8.)

**Discussion**

**I. Standard of Review**

■ "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Spencer Trask Software & Info. Servs. v.*

---

1. Tang Capital also claims that, on December 5, 2008, in a different press release, CTI announced that it had repurchased convertible debt. Tang Capital claims that this action also violates the parties' contract. However, it is not seeking any mandatory injunctive relief to undo that completed transaction.

*RPost Int'l, Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y.2002). In this Circuit, a preliminary injunction—and therefore a TRO—will be granted if the moving party shows that he will suffer irreparable harm absent injunctive relief and either (1) that he is likely to succeed on the merits of his claim; or (2) that there are sufficiently serious questions going to the merits to make them fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000); *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 998–99 (2d Cir.1997).

As a preliminary matter, this Court must first determine whether it has the jurisdiction to invoke its equitable powers in this case. CTI has suggested that the court does not have such jurisdiction. This requires the Court to determine whether injunctive relief is barred by the Supreme Court's decision in *Grupo Mexicano*. It is not.

## II. Grupo Mexicano

### A. The Supreme Court's Decision

In *Grupo Mexicano,* the Supreme Court, reversing the judgment of the lower courts, held that the district court did not have the authority to issue a preliminary injunction. 527 U.S. at 333, 119 S.Ct. 1961.

The respondents had filed a breach of contract claim against the petitioners seeking damages in the amount of $80.9 million. Respondents requested a preliminary injunction to restrain them from transferring "Toll Road Notes," which were considered the petitioners "only substantial asset" and so would be needed to satisfy any judgment that might be entered in the lawsuit. *Id.* at 312, 119 S.Ct. 1961. The district court granted respondents' request for a preliminary injunction,

and the Second Circuit affirmed. The question presented to the Supreme Court was "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310, 119 S.Ct. 1961. The Court answered the question "No."

In analyzing whether a district court has the jurisdiction to issue a preliminary injunction, the Court focused on whether the relief requested was traditionally accorded by courts of equity, because "We have long held that the jurisdiction thus conferred [by The Judiciary Act of 1789] ... is an authority to administer in equity suits the principles of the system of the judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Id.* at 318, 119 S.Ct. 1961 (internal punctuation, quotation and citations omitted).

The Court concluded that the remedy respondents sought—an injunction to restrain the dissipation of assets against the possibility that a money judgment might someday be entered—"was historically unavailable from a court of equity." *Id.* at 333, 119 S.Ct. 1961. Historically, a "creditor's bill could be brought only by a creditor who had already obtained a judgment establishing debt." *Id.* at 319, 119 S.Ct. 1961. Governing this rule was a fundamental historical principle "that before judgment (or its equivalent) an unsecured creditor has no rights at law or equity in the property of his debtor." *Id.* at 330, 119 S.Ct. 1961. Hence, as the Court concluded, "The equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence

.... [so] we have no authority to craft a 'nuclear weapon' of the law like the one advocated here." *Id.* at 332, 119 S.Ct. 1961.

The Court further held that there were strong reasons why a court should not issue such injunction, even if it had the power to do so. First, the type of preliminary injunction at issue implicates the substantive rights of the debtor, which suggests that a general-creditor should first obtain judgment against the debtor so that the creditor can have an interest in the debtor's property which equity could act upon. *See id.* at 322–23, 119 S.Ct. 1961.

A rule of procedure which allowed any prowling creditor, before his claim was definitely established by judgment, and without reference to the character of his demand, to file a bill to discover the business affairs of the alleged debtor, would *manifestly be susceptible of the grossest abuse. A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants.*

*Id.* at 330, 119 S.Ct. 1961 (citation omitted) (emphasis added). A requirement that a "creditor first obtain a prior judgment is a fundamental protection in debtor-creditor law," *id.,* which is even more important because of the debtor's right to a jury trial on the creditor's claim. *Id.*

Second, the Court expressed concern that issuing a prejudgment remedy in a case primarily seeking monetary relief would render Federal Rule of Civil Procedure 64 a nullity. *Id.* ("Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?").

Consequently, the Court held that the District Court, sitting in equity, "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of re-spondents' contract claim for money damages." *Id.* at 333, 119 S.Ct. 1961.

## B. Application

Tang Capital argues that *Grupo Mexicano* does not prohibit this Court from issuing a TRO and a preliminary injunction in this case, because it seeks injunctive relief "to prevent CTI from engaging in a transaction that it is contractually prohibited from completing without Tang Capital's prior written consent." (Pl. Mem. on Grupo Mexicano at 1 (hereinafter, "Pl. Mem.").) Plaintiff contends that it has the right to a permanent injunction to stop CTI from consummating the proposed refinancing, and cites *De Beers Consol. Mines v. U.S.,* 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945)—a case specifically not overturned by *Grupo Mexicano*—for the unremarkable proposition that "a preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." (Pl. Mem. at 3 (*quoting De Beers,* 325 U.S. at 220, 65 S.Ct. 1130).)

CTI responds that *Grupo Mexicano* applies because the relief to which Tang Capital would be entitled if the proposed transaction were consummated is limited to money damages, in an amount equal to the Triggering Redemption Amount.

■ CTI may well be correct that plaintiff is not entitled to injunctive relief, but it is conflating the availability of an adequate remedy at law with the jurisdictional bar of *Grupo Mexicano.* While the distinction between the two concepts may be subtle, it is very real. *Grupo Mexicano* stands for the proposition that a plaintiff who has sued for a completed breach of a contract cannot "secure" the money judgment to which he may someday become entitled by "holding up the money," as it were, through an injunction against any transfer

of defendant's assets—even in an amount anticipated to be needed to obtain the judgment.

But in this case, plaintiff Tang Capital is not suing on a completed breach of contract—the anticipated breach has not yet occurred, because the proposed transaction has not been consummated without his consent. Nor is it trying to prevent defendant from dissipating funds that might otherwise be available to satisfy the judgment Tang Capital does not yet have. Rather, Tang Capital is attempting to vindicate its purported contractual right to keep the transaction from happening. In other words, Tang Capital—in an amended pleading that I anticipate receiving *imminently*—is seeking a preliminary injunction against the consummation of a fourth transaction that CTI proposes to carry out in violation of what plaintiff claims are its contractual rights. Characterized most accurately, Tang Capital is trying to prevent defendant from becoming liable to it for money damages—it is not trying to secure assets in order to satisfy a judgment for money damages. The fact that Tang Capital would be entitled only to money damages if the transaction had taken place before plaintiff was able to prevent it—as was the case with the original transaction that led to this lawsuit, and with the two intervening transactions as well—does not render this Court powerless to stop a proposed violation of contract that has not yet taken place.

Of course, in order to prevail on its claim for injunctive relief, Tang Capital must establish that money damages would be inadequate to compensate it for its injury if the transaction were to go forward. That may prove challenging. Plaintiff has made no such showing in its TRO application. Indeed, the only irreparable harm plaintiff has identified to date is defendant's possible inability to satisfy a judg-

ment against it. In *De Beers*, the Supreme Court emphasized that equitable power has never extended to a contract case where the only alleged "irreparable" harm is that assets might not be available to satisfy a pending judgment. 325 U.S. at 222–23, 65 S.Ct. 1130 ("No relief of this character has been thought justified in the long history of equity jurisprudence.").

But plaintiff also contends that it is seeking specific performance of the contract, and suggests that it is suffering harm from defendant's repeated frustration of Tang Capital's clearly defined contractual right to prevent certain types of transactions from happening, for any reason at all. Tang Capital is entitled to try to convince me that it would be irreparably damaged if no injunction issued to prevent the consummation of the proposed transaction; expedited discovery may well enable it to overcome that hurdle.

The parties have already been advised that a hearing on plaintiff's motion for a preliminary injunction will be held on January 6 at 10 a.m. In view of my conclusion that *Grupo Mexicano* does not bar the Court from entertaining plaintiff's application for a preliminary injunction, the hearing will take place as scheduled. Defendant has represented to the Court that the transaction at issue cannot and will not close before January 12, 2009, so there is no need for any TRO at this juncture. I would of course expect to be advised of any proposed change in that schedule, and counsel CTI not to try to do anything inconsistent with its counsel's representation.

Between now and the hearing, the parties may engage in expedited discovery, limited to two depositions per side of no more than three hours each concerning the proposed transaction and the production of documents relevant to the proposed transaction. All other relevant discovery

should have been taken prior to the discovery deadline in this case, which passed some months ago. Document requests must be served and filed by noon on Friday, December 19, 2008. Deposition witnesses must be identified by the same date. If there are any objections we will deal with them in a telephone conference on Monday, December 22 at noon. At that conference we will go over the Court's rules concerning bench trials, which govern all hearings on applications for preliminary injunctions. There is no need for additional briefing on the fundamental issue of contract construction; I am quickly becoming familiar with the parties' briefs on the pending motion for summary judgment, and they adequately address the only issue that appears relevant to likelihood of success on the merits.[2]

Finally, there is the issue of whether the final trial on the merits of this action must be by jury. The contract clearly contains a waiver of jury trial, and both sides subscribed to that waiver. Counsel for plaintiff nonetheless requested a jury trial when he filed this action. Defendant claims that this constituted a waiver of the contractual provision, one on which it relied in not demanding a jury trial itself.

Waiver is the conscious relinquishment of a known right. Counsel for plaintiff represented to the Court at the December 11 hearing that he was unaware of the contract's jury trial waiver when he demanded trial by jury. I will hear testimony under oath from counsel for plaintiff on this issue at the close of the January 6

hearing. If counsel testifies in accordance with his prior statement, and if I believe him, then as a matter of fact there was no waiver, and the issue of defendant's purported reliance falls by the board. I am constrained to note, however, that defendant really cannot raise any "reliance" argument, because whether plaintiff demanded a jury or not, defendant had no right to demand one under the express terms of the contract. The only issue to be decided is whether plaintiff, by demanding a jury, "waived the waiver."

This constitutes the decision and order of the Court.

**2.** CTI argues that Tang Capital has no contractual right to approve the transactions it has already consummated and the one it proposes to enter, but it argues, in the alternative, that if Tang does have a right to block the proposed transaction, the exercise of that right would violate the covenant of good faith and fair dealing that inheres in every contract. Regrettably for CTI, any such claim appears to be foreclosed by the New York Court of Appeals' recent decision in *Moran v. Erk*, 11 N.Y.3d 452, 872 N.Y.S.2d 696, 901 N.E.2d 187 (2008). In view of *Moran*, if I accept plaintiff's interpretation of the contract, Tang Capital will also be likely to succeed on the merits of the "good faith and fair dealing" claim.