Susan RODDE; Kenneth Younger; Antonio Gaxiola, by and through his father and guardian ad litem Manuel Gaxiola, individually and on behalf of a class of similarly situated persons, Plaintiffs–Appellees,

v.

Diana BONTA, R. N., Dr. P. H., director of the State Department of Health Services, an individual in her official capacity, Defendant–Appellee,

County Of Los Angeles, a public entity; Thomas L. Garthwaite, MD, Director and Chief Medical Officer of defendant County's Department of Health Services, individually and in his official capacity, Defendants Appellants,

and

Does, 1–10, inclusive individually defendants are sued in their official capacities, Defendant.

No. 03–55765.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 1, 2003.

Filed Feb. 5, 2004.

Jennifer A. Chmura, Deputy Attorney General, Los Angeles, CA, for defendant-appellee Diana Bonta. Timothy T. Coates, Greines, Martin, Stein & Richland, Los Angeles, CA, for defendants-appellants County of Los Angeles and Thomas L. Garthwaite.

Jeffrey S. Davidson, (argued), Christopher J. Heck, Joseph M. Graham, Jr., Tony Richardson, Kirkland & Ellis, Los Angeles, CA, for the plaintiffs-appellees; Melinda Bird, Marilyn Holle, Maria F. Iriarte, Protection and Advocacy, Inc., Los Angeles, CA, Eve Hill, Paula D. Pearlman, Felicia Yearwood, Western Law Center for Disability Rights, Los Angeles, CA, Robert Newman, Kimberly Lewis, Western Center on Law and Poverty, Los Angeles, CA, Gerald A. McIntyre, National

Senior Citizen's Law Center, Los Angeles, CA, for plaintiffs-appellees.

Before PREGERSON, COWEN,* and W. FLETCHER, Circuit Judges.

## OPINION

PREGERSON, Circuit Judge.

Los Angeles County and Thomas Garthwaite, Director and Chief Medical Officer of Los Angeles County's Department of Health Services, (the County) plan to reduce the County's health care spending by closing Rancho Los Amigos National Rehabilitation Center (Rancho). Rancho is a County hospital dedicated primarily to providing inpatient and outpatient rehabilitative care to disabled individuals. Plaintiffs are current and future Medi–Cal patients with special needs that require medical services offered at Rancho. They challenged the impending closure of Rancho through this action. The district court granted plaintiffs' request for a preliminary injunction that barred the County from going forward with its planned closure without providing plaintiffs with necessary medical and rehabilitative services elsewhere. The County appealed. We have jurisdiction under 28 U.S.C. § 1292(a), and we affirm.

## I.

Rancho—one of six County hospitals—is a 207–bed facility that specializes in rehabilitation and the acute care needs of patients with chronic diseases. Rancho provides care to about 2,600 inpatients and 8,600 outpatients annually. While most County hospitals predominantly treat the indigent and uninsured, Rancho has a high percentage of patients with public and private insurance. About 67 percent of Rancho's inpatients and 58 percent of Rancho's outpatients are Medi–Cal recipients.[1]

Rancho has served Los Angeles's homeless, mentally ill, disabled and elderly populations since it opened in 1888. Important health care innovations, including the "halo" device used to support the head and neck of spinal cord injury patients, were invented at Rancho. Rancho was also the first facility to replace wood with plastic for prosthetic limbs. By the early 1930s, Rancho was becoming legendary for its occupational therapy. Later, during World War II, Rancho began providing long-term care and rehabilitation for polio patients; in 1954, the majority of the 1,865 Los Angeles area polio victims were treated at Rancho.[2]

In 2002, in an effort to increase efficiency and reduce costs, the County consolidated its clinical services for certain severe disabilities. It did so by moving all acute inpatient rehabilitation, chronic ventilator/pulmonary services, and pediatric orthopedic surgery for selected neuromuscular disorders to Rancho. Before that time, these services were also offered at other County facilities. Because of the consolidation, currently about 60 percent of Rancho's inpatients are transferred to Rancho from the other five County hospitals.

---

* The Honorable Robert E. Cowen, Senior United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

1. The state of California participates in the federal Medicaid program through its Medi–Cal program. The County, a Medi–Cal healthcare provider, agreed to conform with federal (Medicaid) regulations in its contract with California.

2. Cecilia Rasmussen, *Farm for Ill and Destitute Grew Into a Place of Hope*, L.A. Times, December 7, 2003, at B4.

Rancho is a unique facility; no other facility in the area currently provides many of the services it offers.[3] Because many disabled patients will be unable to find necessary medical treatment elsewhere if Rancho closes, doctors anticipate that closing Rancho will have a devastating effect on the facility's disabled patients, including plaintiffs.[4] Doctors are also con-

3. Plaintiffs introduced ample evidence on this point. For example, declarations submitted by plaintiffs include the following observations. Dr. Michael Finocchiaro, physician specialist in Urology Services in Rancho's Urology Department: "If Rancho Los Amigos closes,[certain] kinds of urology and related ancillary services ... would not be available elsewhere in the county for Medi–Cal patients;" Dr. Andrea Kachuck, pediatrician, former Rancho physician, and former Medical Director of Los Angeles County's California Children's Services program: "[S]tudies have shown that the capacity for care of the population served by Rancho does not exist elsewhere in Los Angeles County;" Dr. Michael Laidlaw, second year resident at Los Angeles County–USC Hospital: "Rancho provides services which are simply not available elsewhere within the County system," for example, a liver service for chronic liver disease and services for diabetics with osteomyelitis; Dr. Ed Newton, Interim Chair of the Emergency Department at Los Angeles County–USC Hospital: "I know of no other facility that will take uninsured patients requiring rehabilitation care;" Dr. Salah Rubayi, Chief of Pressure Ulcer Management Program at Rancho: "I am not aware of any alternative pressure sore management venue available to MediCal patients in the event that Rancho Los Amigos were to close;" Dr. Kate Savage, orthopedic surgeon, Los Angeles County–USC Hospital and former Rancho employee: "The only place to perform amputations is at Rancho.... If Rancho goes, we will have no place to refer our uninsured patients who require medical procedures related to spinal conditions;" Dr. Scott Selco, fourth year resident in neurology at Los Angeles County–USC Hospital: "Rancho is really the only place we can send our patients for post-stroke rehabilitation services;" Dr. Michael Windland, third year resident in internal medicine at Martin Luther King Jr. Hospital: "I know of no other place to send [certain] patients if Rancho closed."

4. Plaintiffs introduced abundant evidence on this point, including declarations containing the following predictions. Dr. Amit Batra, fourth year Adolescent Medicine Fellow with the Department of Family Medicine at Harbor/UCLA Medical Center: "If Rancho were to close, I do not believe there would be adequate or sufficient providers to care for its patients in the private rehabilitation community;" Dr. Helena Chui, Chairman of the Department of Neurological Sciences and Associate Director of Neurological Rehabilitation at Rancho: "[T]he proposed closure [of Rancho] would have disastrous consequences for rehabilitation patients on Medi–Cal or pending MediCal insurance—both those who need inpatient and outpatient rehabilitation;" Dr. Finocchiaro: "Without the appropriate and essential medical tests, procedures, treatments and devices provided by the combined specialty services at Rancho Los Amigos, patients would most likely end up with more serious medical problems;" Audrey Goldman, social worker and program manager for the National Multiple Sclerosis Society, Southern California Chapter: "The closing of the Rancho facility would be devastating to current and new MS patients that depend on the Rancho MS clinic for ongoing management of their chronic illness;" Dr. Brian Johnston, Chair of the Department of Emergency Medicine at White Memorial Hospital: "The Rancho Los Amigos patients are among the most complicated and difficult patients to treat in Los Angeles County.... To take these patients out of the Rancho environment and drop them elsewhere is simply outrageous. The current County system cannot absorb them.... The private sector simply does not have the capacity to absorb these patients either;" Bryan Kemp, Chief of Geriatrics and Aging, Director of Gerontology Services and Aging Programs, and Director of Rehabilitation Research and Training Centers on Aging with a Disability at Rancho: "[T]he proposed closure [of Rancho] would have disastrous consequences for patients on Medi–Cal who are aging with a disability—both those who need inpatient and outpatient rehabilitation;" Dr. Jacquelin Perry, medical consultant to the Pathokinesiology Laboratory at Rancho and Professor Emeritus in Orthopedics at USC: "The massive disruption in the availability of rehabilitation services which will result if Rancho closes will inevitably cause long delays in transferring patients out of acute hos-

cerned that closing Rancho will negatively impact the treatment of patients at other County facilities as well as important medical training and research.[5]

Nevertheless, on January 28, 2003, the County decided to close Rancho because of anticipated future budget deficits. The County planned to reduce services at Rancho beginning May 1, 2003, and to fully close the hospital by June 30, 2003. The County expects to save $58.6 million annually by closing Rancho. However, the County's calculation does not take into account the cost of providing Rancho patients with care at other County facilities.

Although the County was expecting a budget deficit when it began studying cost-cutting proposals, a new infusion of Medicaid funding has helped the County's health care system end the 2002–2003 fiscal year with over $300 million in its fund balance. The County now projects that it will have almost the same amount in its fund balance for fiscal year 2003–2004 and nearly $200 million at the end of fiscal year 2004–2005. No shortfall is expected until 2006–2007.

## II.

Shortly after the County decided to shut down Rancho, plaintiffs filed this action to enjoin the impending closure. Plaintiffs are a certified class of Medi–Cal recipients

---

pitals to rehabilitation programs, even assuming that a rehab program can be found. Yet delaying the start of rehabilitation services can make treatment far more difficult and in some cases, may defeat it entirely;" Dr. Rubayi: "I would expect the number of[ ] acute cases to rise significantly if disabled MediCal patients are deprived of the wound management and rehabilitation services currently available to them only through Rancho Los Amigos;" Freddi Segal–Gidan, physician assistant, gerontologist, and Director of Stroke Research and Education at Rancho: "[T]he proposed closure would have disastrous consequences for seniors in Los Angeles County on Medi–Cal and indigent seniors who are in need of inpatient and outpatient geriatric and stroke rehabilitation."

5. This prediction is well supported by the record, which includes declarations with these cautionary statements. Dr. Batra: "The proposed closure of Rancho will create tremendous pressure on the availability of services for patients who rely on the County's health care system, particularly its hospitals and trauma centers;" Dr. Dong Chang, third year resident in internal medicine at Harbor–UCLA Medical Center: "Should Rancho ... close, the number of chronic patients at Harbor–UCLA would increase dramatically. This would mean that we couldn't admit critical patients from our emergency room.... Rancho ... is the best research center in the County.... Rancho provides an educational

experience that can't be found anywhere else in the system;" Dr. Irene Gilgoff, Chairperson of the Department of Pediatrics at Rancho: "Advances in medical care are only possible when expertise is allowed to flourish. That is why there are cancer centers, HIV centers.... Rancho is the specialty care center for the disabled;" Dr. Daniel Higgins, Director of Emergency Medical Services at St. Francis Medical Center: "The closure and reduction of services at Rancho ... will exacerbate an already devastating domino effect caused by the recent decision to close various County health facilities" and will ultimately "increas[e] health costs ... and the suffering and chances for mortality;" Dr. Laidlaw: "If [Rancho] closes or reduces its services, the work in [County–USC Hospital] will be made more difficult. We will be unable to handle the load and acutely ill patients will be unable to find hospital beds;" Dr. Newton: "Any reductions in county health services will significantly impact health care countywide.... If Rancho ... closes it would be a disaster. Patients admitted through trauma often need long-term rehabilitation. We need Rancho as an outlet to transfer uninsured patients to;" Dr. Andrew Shpall, fourth year resident physician of Urology at Los Angeles County–USC Hospital with past experience working at Rancho: "Physician training at Rancho ... is essential in adequately preparing Urology physicians. The closing of Rancho will result in less experienced and less skilled physicians."

who receive medical care at Rancho. Specifically, they include:

All present and future recipients of the Medicaid program: (a) who reside in the County of Los Angeles; (b) who have or will have disabilities; and (c) who, because of their disabilities[,] need or will need inpatient and/or outpatient rehabilitative and other medical services that are currently provided at Rancho Los Amigos National Rehabilitation Center.[6]

Plaintiffs asserted Medicaid claims against a defendant state official alone, and asserted an Americans with Disabilities Act (ADA) claim against all defendants, including the County. Plaintiffs then filed a motion for a preliminary injunction, seeking to enjoin the state and the County from terminating or reducing Medi–Cal covered inpatient and outpatient services at Rancho. The district court certified the class and granted plaintiffs a temporary restraining order on the same day.

After further briefing, the district court granted plaintiffs' request for a preliminary injunction. The court's injunction bars the County

from closing Rancho ... or terminating reducing or making any further reductions in any inpatient or outpatient medical services ... at Rancho which are covered by the Medi–Cal program until [the County] can assure the Court that plaintiffs and members of the class will continue to receive comparable inpatient or outpatient services from other Medi–Cal providers in Los Angeles County and that they will receive these ... services in a timely manner and to the same extent as members of the general population; and/or that plaintiffs and members of the class will continue to have the same access to inpatient and outpatient services at other health care facilities within the Los Angeles County health care system that they experienced at Rancho as of the filing of this lawsuit on March 6, 2003.[7]

In support of its ruling, the district court found that the County consolidated services for the severely disabled at Rancho, which annually serves more than 9,500 patients, about 50 percent of which are covered by Medi–Cal. The court found that plaintiffs' needs "could not and would not be met in the Los Angeles community" without Rancho, and that closing the facility would harm many of its Medi–Cal patients because they would be unable to obtain substitute care elsewhere. The district court also concluded that closing Rancho as planned would violate federal law because there was no evidence the County could transition Rancho patients before the closure, and further that the County's contract with the state required it to comply with Medicaid regulations. Further, the district court held that plaintiffs' ADA claim was likely to succeed on the merits.

The district court concluded that absent preliminary relief, plaintiffs would suffer "severe, irreparable harm" as a result of

---

6. For example, named plaintiff and class representative Susan Rodde, a County resident and Medi–Cal recipient, alleges that she has cerebral palsy, allergies to common medications, urology problems, pressure sore problems, arthritis, and orthopedic issues. She is a past Rancho inpatient and currently receives Rancho outpatient services up to three times a week. According to the complaint, "despite a diligent search, [Ms. Rodde] has been unable to identify any provider of Medi–Cal funded rehabilitations and outpa-

tient services that can treat her condition other than Rancho." Ms. Rodde's declaration, filed in support of plaintiffs' motion for a preliminary injunction, explains in detail the extent to which she relies on Rancho for necessary medical attention.

7. The injunction did not issue against the defendant state official because, as the district court observed, the state lacked the right to close Rancho and had not threatened to do so.

"lack of access to preventive care" and "medical complications, amputations, increased risk of death, infection, organ failure, and loss of functional ability." The court also considered the County's projected budget shortfall. The district court was not persuaded that closing Rancho would, as the County claims, save the County $58.6 million annually because the County did not account for the added cost of providing services to current Rancho patients elsewhere. The court found it "abundantly clear ... that the harm to the plaintiffs if Rancho closes[ ] far outweighs the harm to the County if it remains open." Finally, evidence that closing Rancho would add pressure to an overburdened County health care system persuaded the district court that the injunction served the public interest.

## III.

### A. Preliminary Injunctive Relief

■■■ To obtain a preliminary injunction in the district court, plaintiffs were required to demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff[s] if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff[s], and (4) advancement of the public interest (in certain cases)." *Johnson v. Cal. State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir.1995) (citation and internal quotation marks omitted). Alternatively, injunctive relief could be granted if the plaintiffs "demonstrate[d] *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised

and the balance of hardships tips sharply in [their] favor." *Id.* (emphasis in original; citations and internal quotation marks omitted). "These two alternatives represent extremes of a single continuum, rather than two separate tests...." *Clear Channel Outdoor Inc. v. City of Los Angeles,* 340 F.3d 810, 813 (9th Cir.2003) (internal citation and quotation marks omitted). As a result, "the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success" must be established by the party. *Id.* (citation omitted).

"In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992) (citing *Caribbean Marine Servs., Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988)).[8]

### B. Appellate Review

■■ In general, we review the denial of a preliminary injunction for abuse of discretion. *Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 730 (9th Cir.1999); *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 730 (9th Cir.1999). The district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Rucker v. Davis,* 237 F.3d 1113, 1118 (9th Cir. 2001) (en banc), *rev'd on other grounds, Dep't of Hous. & Urban Dev. v. Rucker,* 535 U.S. 125, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002). When the district court is

---

8. In an attempt to show an abuse of discretion, the County argues that the district court applied the wrong preliminary injunction standard. The County maintains that the plaintiffs cannot simply raise *serious questions,* but instead must show a *strong likelihood of success on the merits* because they seek to enjoin legislative action taken by a duly appointed public body. But we have not adopted the heightened preliminary injunction standard urged by the County. The district court relied on the well-established preliminary injunction standard uniformly used in this Circuit. Doing so was not an abuse of discretion.

alleged to have relied on an erroneous legal premise, we review the underlying issues of law *de novo*. *Does 1–5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir.1996).

■■■ Our review of a decision regarding a preliminary injunction "is limited and deferential." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.2003) (en banc). The court "do[es] not review the underlying merits of the case." *Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir.1995). Rather, our "inquiry is at an end" once we determine that "the district court employed the appropriate legal standards which govern the issuance of a preliminary injunction, and ... correctly apprehended the law with respect to the underlying issues in litigation." *Cal. Profile Council Political Action Comm. v. Scully*, 164 F.3d 1189, 1190 (9th Cir.1999) (internal citation and quotation marks omitted).

## IV.

### A. Likelihood of Success: Title II of the ADA

The district court did not abuse its discretion in concluding that plaintiffs established a likelihood of success on the merits of their ADA claim.

■■■ Title II of the ADA prohibits discrimination in public services and programs. To establish a violation of the ADA, a plaintiff must demonstrate: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from partic-

ipation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Weinreich v. Los Angeles County MTA*, 114 F.3d 976, 978 (9th Cir.1997) (emphasis omitted).

Applying this standard, the district court concluded that plaintiffs demonstrated a likelihood of success on their ADA claim. The County does not dispute that plaintiffs are qualified individuals with disabilities, or that as a public entity its health care program is covered by the ADA.[9] Instead, the County's arguments focus on whether the services plaintiffs would lose with Rancho's closure fall within the scope of care the County must provide to plaintiffs consistent with the ADA. For the reasons set forth below, we conclude that they do.

The County attacks "the very premise of the district court's definition of the benefit" at issue—the notion that plaintiffs are entitled to "the specialized medical expertise" they need for adequate medical care—as contrary to Supreme Court precedent.[10] The district court considered this argument, but found the County's precedent distinguishable and its contention unpersuasive. We agree.

At the core of the County's argument is *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In *Al-*

9. The County also does not take exception with the district court's conclusion (and the plaintiffs' continued contention) that the discrimination at issue here is "by reason of" plaintiffs' disabilities.

10. The County also argues that the district court's suggestion that the public "benefit" at issue here is Medi–Cal benefits is plainly erroneous because the state rather than the County provides Medi–Cal benefits. Although the district court did observe that closing Rancho

would effectively deny plaintiffs the benefits of Medi–Cal, it also commented that "the closing of Rancho can lead to denial of benefits to the disabled in that they will receive inadequate or harmful medical treatment due to the lack of access to the specialized medical expertise available at Rancho." There is no real dispute here; plaintiffs agree that the benefit at issue is County patients' access to Medi–Cal covered services from County facilities.

*exander*, to save money, Tennessee proposed reducing the number of annual days of inpatient care covered by the state Medicaid program from 20 to 14 for all program participants. The evidence suggested that about 27 percent of disabled participants required more than 14 days of care, while only about 8 percent of non-disabled participants required more than 14 days. *Id.* at 289–90, 105 S.Ct. 712. Plaintiffs challenged the proposed reduction as discriminatory (under Section 504 of the Rehabilitation Act) because it would have a disproportionate effect on the disabled. The Supreme Court concluded that the planned reduction was not discriminatory because it did not deny the disabled the benefits of the 14 days of care the state chose to provide; rather, the plan left all patients

> with identical and effective hospital services fully available for their use, with both classes of users subject to the same durational limitation.
>
> . . .
>
> Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. Instead, the benefit provided through Medicaid is a particular package of health care services, such as 14 days of inpatient coverage. That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not "adequate health care." . . .
>
> Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance. . . . The Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid.

*Id.* at 302–04, 105 S.Ct. 712 (internal citation omitted).

The *Alexander* Court specifically noted that there was no "suggestion" in the record "that the illnesses uniquely associated with the handicapped or occurring with greater frequency among them cannot be effectively treated, at least in part, with fewer than 14 days' coverage." *Id.* at 302 n. 22, 105 S.Ct. 712.

We applied *Alexander* in *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir.1996), where we held that a Hawaii law requiring carnivorous animals entering the state to be quarantined violated the ADA:

> Although Hawaii's quarantine requirement applies equally to all persons entering the state with a dog, its enforcement burdens visually-impaired persons in a manner different and greater than it burdens others. Because of the unique dependence upon guide dogs among many of the visually-impaired, Hawaii's quarantine effectively denies these persons . . . meaningful access to state services, programs, and activities while such services, programs, and activities remain open and easily accessible by others. The quarantine, therefore, discriminates against the plaintiffs by reason of their disability.

*Id.* at 1484.

*Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 846 F.Supp. 986 (S.D.Fla.1994), cited by plaintiffs and the district court, also relied on *Alexander*. In *Dreher Park*, a Florida city had made available recreational and social programs and activities for disabled individuals at Dreher Park. *Id.* at 988. Budget constraints caused the city to make various cuts, including effectively eliminating the existing recreational programs for disabled individuals. *Id.* at 989. Plaintiffs challenged the cuts under the ADA, and the court granted their request for a preliminary injunction. The court concluded

that the complete elimination of the programs at Dreher Park likely violated the ADA because there were no equivalent programs available to fill the void left by the closure. Although disabled individuals could theoretically participate in the general recreational programs the city offered at other locations,

> it is clear that many of the general programs are unable to offer the benefits of recreation to individuals with disabilities because of the nature of the recreational activities and the physical and other limitations of persons with disabilities.... It appears from the evidence that City had offered the Dreher Park Center programs precisely because they were needed to give equal benefits of recreation to persons with disabilities. When these programs were eliminated, Plaintiffs were denied the benefits of the City's leisure services in contravention of Title II.
>
> ...
>
> Title II ... require[s] that any benefits provided to non-disabled persons must be equally made available for disabled persons.

*Id.* at 991–92.

*Alexander* is distinguishable from the instant case. The reduction at issue in *Alexander* was facially neutral—the maximum hospital stay for *all* patients was reduced to 14 days. The County's argument that its proposed cuts are similarly "across-the-board" because it also plans to reduce the beds at County–USC Hospital (and already has eliminated some clinics) is unpersuasive. Reductions analogous to the cut in *Alexander* might include eliminating X dollars or Y percent of funding

from the budget of each of the County's six hospitals or from each medical department or type of service offered therein. Eliminating entirely the only hospital of six that focuses on the needs of disabled individuals (because the County earlier decided to consolidate such services at that hospital) and that provides services disproportionately required by the disabled and available nowhere else in the County is simply *not* the sort of facially neutral reduction considered in *Alexander*. *Alexander* may allow the County to step down services equally for *all* who rely on it for their healthcare needs, but it does not sanction the wholesale elimination of services relied upon disproportionately by the disabled because of their disabilities.

■ Moreover, the Court in *Alexander* specifically noted that nothing in the record suggested "that the illnesses uniquely associated with the handicapped or occurring with greater frequency among them cannot be effectively treated, at least in part, with fewer than 14 days' coverage." 469 U.S. at 302 n. 22, 105 S.Ct. 712. Here, in contrast, plaintiffs presented ample evidence that rehabilitative services and treatment for complex and disabling medical conditions, such as paralysis and conditions associated with severe diabetes, cannot currently be provided effectively anywhere in the County system but Rancho. While the proposed cutback in *Alexander* did not uniquely affect disabled individuals, the County's planned cutback specifically targets services for the disabled. Even after *Alexander*, the ADA prohibits the County from eliminating healthcare services for the disabled in this manner.[11]

---

**11.** The County also cites to *Alexander's* Second Circuit progeny, *Cercpac v. Health & Hospitals Corp.*, 147 F.3d 165 (2d Cir.1998), and *Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000), but those decisions are similarly factually distinguishable. In *Cercpac*, plaintiffs challenged the closure of a specialized facility

where the bulk of the services provided at that facility were to be provided at a new location one mile away. 147 F.3d at 168. The County has not introduced evidence of a similar relocation plan here. Indeed, the injunction only bars the County from closing

■ Further, in *Crowder*, we confirmed that, even in the wake of *Alexander*, state action that disproportionately burdens the disabled because of their unique needs remains actionable under the ADA. 81 F.3d 1480. As in *Crowder*, the closure of Rancho would deny certain disabled individuals meaningful access to government-provided services because of their unique needs, while others would retain access to the same class of services.

Like the district court, we find the *Dreher Park* decision persuasive; it presents an analogous fact pattern, applies *Alexander*, and reaches a fair and well-reasoned result. In both *Dreher Park* and this case, the government first consolidated services for the disabled at a single facility. Then, due to budget shortages, the government decided to close the single facility providing specialized programs for the disabled, while continuing to operate the facilities providing the same category of services to non-disabled individuals. While the disabled could theoretically seek service from the remaining facilities, the evidence suggested in *Dreher Park*, as it does here, that the services designed for the general population would not adequately serve the unique needs of the disabled, who therefore would be effectively denied services that the non-disabled continued to receive. In light of all these parallels, the district court did not abuse its discretion in adopting *Dreher Park's* conclusion that such action violates the ADA and warrants an injunction.

In sum, plaintiffs demonstrated that if the County closes Rancho, it will reduce, and in some instances eliminate, necessary medical services for disabled Medi–Cal patients while continuing to provide the medical care required and sought by Medi–Cal recipients without disabilities. The district court relied on the correct legal standards and its factual findings are supported by the record.[12] Therefore, the district court did not abuse its discretion in concluding that closing Rancho without continuing to provide medically necessary services to disabled individuals elsewhere would constitute discrimination on the basis of disability.[13]

### B. Balance of Interests

■ The district court did not abuse its discretion in concluding that plaintiffs would suffer greater hardship absent pre-

---

Rancho until the County demonstrates that it is prepared to provide Rancho's services elsewhere.

In *Wright*, the court concluded that the district court did not abuse its discretion in denying plaintiffs' request for a preliminary injunction where the record was incomplete and the requested injunction would change, rather than maintain, the *status quo*. 230 F.3d at 546–48. In contrast, the record in this case is replete with evidence of an ADA violation and extreme hardship to plaintiffs as a result, and plaintiffs seek only to maintain the *status quo* while this litigation is pending.

12. The County faults the district court for its "suggestion that the scope of the County's obligation to provide care to disabled Medi–Cal beneficiaries consistent with the ADA must be measured as against the availability of services in the private sector."

But the district court's injunction does not explicitly measure the County's responsibility to its disabled patients against the treatment available to the disabled through private health care providers. Rather, the court enjoined the County from reducing services at Rancho until the County "can assure the Court that plaintiffs and other members of the class will continue to receive comparable inpatient or outpatient services from other Medi–Cal providers in Los Angeles County." We read the injunction to ensure only that the *County* make necessary healthcare services equally available to all, regardless of the services that private facilities might offer.

13. Because we conclude that plaintiffs' ADA claim adequately supports the preliminary injunction, we need not address plaintiffs' Medicaid claims.

liminary relief than the County would suffer because of the injunction.

Plaintiffs introduced compelling evidence that they likely will suffer irreparable harm if the County closes Rancho at this time. This harm includes delayed and/or complete lack of necessary treatment, and increased pain and medical complications.[14]

The County's interest in balancing its health care budget and controlling costs is strong. However, the evidence shows that the County currently has a surplus and does not expect to experience a deficit until fiscal year 2006–2007. Further, while the County asserts that it will save $58.6 million annually by closing Rancho, in calculating its projected savings the County failed to consider the increased cost of serving Rancho patients at other facilities. Displaced patients will need to be treated somewhere, and the evidence suggests that unless Rancho's unique services are replaced, costs will likely *increase* with Rancho's closure because of medical complications caused by the lack of appropriate treatment. Thus, while it is unclear just how much financial hardship the district court's injunction creates for the County, it is apparent that the cost is lower than the County contends.

Moreover, the injunction does not mandate that the County keep Rancho open at any cost; rather, it requires the County to somehow, somewhere, continue to offer the services currently provided at Rancho. The County is free to reorganize its health care system to increase efficiency and reduce costs, so long as it does so in an even-handed, non-discriminatory manner. As we have maintained, "[f]aced with[ ] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler,* 713 F.2d 1432, 1437 (9th Cir.1983).

C. Public Interest

█ Public interest considerations weigh on both sides of the scale. Permitting the County to self-govern without judicial interference and allowing it to achieve a balanced budget in the future serve the public. But plaintiffs demonstrated that closing Rancho would place more pressure on the already overwhelmed County health care system, leading to increased delays in treatment and prolonged suffering and illness among all those who rely upon it. Closing Rancho would also impair the progress of important medical training and research currently conducted there.

In light of plaintiffs' strong showing of probable irreparable harm to plaintiffs and the public at large, the district court did not abuse its discretion by concluding that the public interest favored issuance of a preliminary injunction.

V.

Our review of the district court's decision to grant a preliminary injunction is limited and deferential. The district court applied the appropriate legal standards in evaluating the merits of plaintiffs' ADA claim, and made no erroneous factual finding. The district court also considered all competing considerations in weighing the threat of irreparable harm to plaintiffs against the hardships asserted by the County, as well as public interest concerns.

**14.** That plaintiffs sought to preserve, rather than alter, the *status quo* while they litigate the merits of this action also strengthens their position.

The district court therefore did not err in granting the injunction.

AFFIRMED.