366 F.3d 754
 Gary HARRIS; Susan Haggerty, an individual; Ping Yu, an individual; Luther Rabb, an individual; Medhat Elsadoni, an individual; Dean Lane, an individual; Joan Moxley-Brown, an individual; Mary Phong; Los Angeles Coalition to End Hunger and Homelessness, Plaintiffs-Appellees,
v.
BOARD OF SUPERVISORS, LOS ANGELES COUNTY; Los Angeles County Department of Health Services; Thomas L, Garthwaite, MD, Director of Department of Health Services, Defendants-Appellants.
 No. 03-56028.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 1, 2003.
 Filed April 27, 2004.
 
 COPYRIGHT MATERIAL OMITTED Timothy T. Coates, Greines, Martin, Stein & Richland LLP, Los Angeles, CA, for defendants-appellants Los Angeles County Board of Supervisors, Thomas L. Garthwaite, M.D. and Los Angeles County Department of Health Services.
 Mark D. Rosenbaum (argued and brief) and Ben Wizner (brief), ACLU Foundation of Southern California, Los Angeles, California, and Yolanda Vera (argued), Barbara Frankel, Sonal Ambegoakar, Susan Lee, Michelle Lilienfeld, Neighborhood Legal Services of Los Angeles County, Los Angeles, CA, Yolanda Arias, Elena Ackel, Silvia R. Argueta, Legal Aid Foundation of Los Angeles, Los Angeles, CA, Gill Deford, Center for Medicare Advocacy, Inc., Willimantic, CT, for all plaintiffs-appellees.
 Astrid G. Meghrigian (brief), San Francisco, CA, for amicus curiae California Medical Association.
 Appeal from the United States District Court for the Central District of California; Florence Marie Cooper, District Judge, Presiding. D.C. No. CV-03-02008-MC.
 Before PREGERSON, COWEN,* and W. FLETCHER, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 On January 28, 2003, the Board of Supervisors of Los Angeles County[1] voted to reduce expenditures by closing Rancho Los Amigos National Rehabilitation Center (Rancho) and by reducing the number of hospital beds at Los Angeles County-USC Medical Center (LAC-USC). Rancho is a county hospital dedicated primarily to providing inpatient and outpatient rehabilitative care; LAC-USC, also a county hospital, is an acute care facility that provides a full range of hospital services. Plaintiffs challenged the planned closure and reduction through this action. The district court granted plaintiffs' request for a preliminary injunction, barring the County from going forward with its plan. The County appealed, challenging the district court's decision that plaintiffs have standing to sue and the court's issuance of an injunction. We have jurisdiction under 28 U.S.C. § 1292(a), and we affirm.
 
 I. Factual Background
 A. The County Healthcare System
 
 2
 In March 2002, the County closed several primary health care centers that served the indigent and working poor. These closures effectively eliminated 54,000 office visits per year. Later that year, the County closed additional facilities, eliminating 60 hospital beds and 500,000 office visits per year. In addition, since 1994, the County has eliminated about 750 beds from its inpatient system. This constitutes a 30 percent reduction. As a result, county emergency rooms are overwhelmed, creating what witnesses in this case have called an "extremely dysfunctional and dangerous patient environment," in which "people are dying preventable deaths." Some patients spend up to 48 hours or more on a gurney in a county emergency room waiting to get a bed, and patients sometimes wait hours or days for necessary emergency surgeries.
 
 
 3
 Nevertheless, on January 28, 2003, the County decided to close Rancho, one of only six county hospitals, because of anticipated future budget deficits. The County planned to reduce services at Rancho beginning May 1, 2003, and to close the facility entirely by June 30, 2003. In addition, the County planned to eliminate 100 hospital beds from another of its six hospitals, LAC-USC, over a two-year period. However, by the time the district court issued an injunction, no budget shortfall was expected until 2005-06 at the earliest.
 
 
 4
 B. Rancho Los Amigos National Rehabilitation Center
 
 
 5
 Rancho is a 207-bed facility that specializes in rehabilitation and the acute care needs of patients with chronic diseases.[2] As we explained in Rodde:
 
 
 6
 Rancho has served Los Angeles's homeless, mentally ill, disabled and elderly populations since it opened in 1888. Important health care innovations, including the "halo" device used to support the head and neck of spinal cord injury patients, were invented at Rancho. Rancho was also the first facility to replace wood with plastic for prosthetic limbs. By the early 1930s, Rancho was becoming legendary for its occupational therapy. Later, during World War II, Rancho began providing long-term care and rehabilitation for polio patients; in 1954, the majority of the 1,865 Los Angeles area polio victims were treated at Rancho.
 
 
 7
 357 F.3d at 990 (citation omitted).
 
 
 8
 Rancho annually provides care to about 2,600 inpatients and 8,600 outpatients. County doctors rely heavily on Rancho to rehabilitate patients with infectious diseases and neurological, orthopedic, and liver conditions. It is the only facility that offers post-stroke rehabilitation for patients discharged from LAC-USC. Rancho is a unique facility; no other facility in the area currently provides many of the services it offers. See id. at 991 & n. 3. Plaintiffs' evidence shows that the County would be unable to meet the medical needs of the indigent and uninsured if it closed Rancho.
 
 C. Los Angeles County-USC Medical Center
 
 9
 LAC-USC provides 30 percent of the county's emergency care needs and almost 50 percent of the county's trauma care for insured and uninsured patients. The hospital can accommodate up to almost 1,400 beds, but currently is budgeted to provide only 750 beds; the County's plan would lower this number to 650. Ninety-nine percent of LAC-USC's 750 available beds are full at any given time. The evidence demonstrates that the hospital is overcrowded, and patients spend long hours — and sometimes days — in the emergency department waiting to be admitted. The evidence also shows that delayed treatment because of overcrowding is causing preventable deaths, and that the proposed reduction in beds will exacerbate the existing situation. Further, one study concluded that eliminating 100 beds from LAC-USC will cause a 20 percent increase in the number of patients with medical needs leaving emergency departments without being seen by a health care professional.
 
 
 10
 In addition, LAC-USC's current ambulance diversion rate (the percentage of time the emergency room is closed to incoming ambulances) is already unacceptably high by medical standards. The proposed bed reduction will increase LAC-USC's ambulance diversion rate. As the ambulance diversion rate increases, so do the morbidity and mortality rates for transported patients.
 
 D. Plaintiffs
 
 11
 Plaintiffs are eight indigent and uninsured county residents with serious health problems who regularly rely upon the county health care system for routine, rehabilitative, and emergency care. They are: Medhat Elsadoni, who recently suffered a heart attack, waited ten days for a bed to become available at LAC-USC, then waited three additional days for necessary surgery (which was interrupted and continued after a seven hour delay) and is now on five medications; Luther Rabb, a former inpatient and current outpatient at Rancho who is paralyzed and confined to a wheelchair; Gary Harris, also a former inpatient and current outpatient at Rancho who was confined to a wheelchair due to a spinal cord injury but learned to walk on crutches at Rancho; Susan Haggerty, a diabetic amputee who is a Rancho outpatient and former inpatient and who may still have an unhealed bone infection; Dean Lane, who waited ten months for necessary wrist surgery at LAC-USC and has been unable to alleviate his pain and swelling or to find work due to the delay; and Ping Yu, Joan Moxley-Brown, and Mary Phong, who each suffer from multiple medical conditions including liver problems, hypertension, hyperlipidemia, diabetes, breast cancer, arthritis, asthma, and partial blindness. Los Angeles Coalition to End Hunger and Homelessness (LACEHH), a non-profit organization composed of indigent individuals who depend upon the county health care system, is also a plaintiff.
 
 
 12
 * * *
 
 
 13
 Plaintiffs presented evidence that the county healthcare system is not equipped to absorb indigent and uninsured patients, including themselves, who would be displaced by the threatened closure of Rancho and the reduction of beds at LAC-USC. Further, plaintiffs submitted evidence that the County's proposal would delay treatment, cause avoidable death, disease, and suffering, increase risk of infections, spread of communicable diseases, and medical complications, and ultimately lead to unnecessarily lengthy and expensive hospitalizations.
 
 II. Procedural Background
 
 14
 Shortly after the County decided to close Rancho and to eliminate 100 beds at LAC-USC, plaintiffs filed this action to enjoin the impending service reductions. Plaintiffs moved for a preliminary injunction soon after filing suit. Judge Florence Marie Cooper of the Central District of California held that plaintiffs had standing to pursue their action. The district court also concluded that plaintiffs established a likelihood of success on their California Welfare and Institutions Code claims and their Medicaid discharge planning claim.
 
 
 15
 In support of that decision, the district court found that the county health care system presently lacks the ability and specialized expertise to absorb Rancho's patients, and that the County's hospitals are not equipped to accommodate the patients that would be displaced from LAC-USC by the proposed reduction in beds. Thus, the district court concluded that plaintiffs would suffer irreparable injury absent a preliminary injunction:
 
 
 16
 The closing of Rancho and the proposed bed reduction at LAC/USC will result in dangerous delays of needed medical treatment resulting in unnecessary deaths, strokes, heart attacks, amputations, renal failure, blindness, seizures, severe pain, and increased risk of infection; it will result in the spread of communicable diseases, including respiratory illnesses such as tuberculosis, antibiotic-resistant staphylococcus; it will result in complications from delayed rehabilitative services, including joint deformities and arthritis, life-threatening pressure sores, and muscle atrophy; it will result in patients being discharged without access to appropriate follow-up rehabilitation care; and it will result in unnecessarily lengthy and expensive hospitalizations.
 
 
 17
 Finally, the district court held that the likely severe and irreparable physical harm to plaintiffs outweighed any potential harm to the County, and that the public interest favored the granting of an injunction.
 
 III. Standards of Review
 A. Preliminary Injunction Standard
 
 18
 To obtain a preliminary injunction in the district court, plaintiffs were required to demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff[s] if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff[s], and (4) advancement of the public interest." Johnson v. Cal. State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir.1995) (citation and internal quotation marks omitted). Alternatively, injunctive relief could be granted if plaintiffs "demonstrate[d] either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in[their] favor." Id. (emphasis in original; citations and internal quotation marks omitted). "These two alternatives represent extremes of a single continuum, rather than two separate tests...." Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir.2003) (internal citation and quotation marks omitted). As a result, "the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success" must be established by the party. Id. (citation omitted).
 
 
 19
 "In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir.1992) (citing Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988)).[3]
 
 B. Appellate Review Standards
 
 20
 In general, we review the denial of a preliminary injunction for abuse of discretion. Walczak v. EPL Prolong, Inc., 198 F.3d 725, 730 (9th Cir.1999); Bay Area Addiction Research & Treatment, Inc. v. City of Antioch, 179 F.3d 725, 730 (9th Cir.1999). The district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." Rucker v. Davis, 237 F.3d 1113, 1118 (9th Cir.2001) (en banc), rev'd on other grounds, Dep't of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002). When the district court is alleged to have relied on an erroneous legal premise, we review the underlying issues of law de novo. Does 1-5 v. Chandler, 83 F.3d 1150, 1152 (9th Cir.1996).
 
 
 21
 Our review of a decision regarding a preliminary injunction "is limited and deferential." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir.2003) (en banc). The court "do[es] not review the underlying merits of the case." Gregorio T. v. Wilson, 59 F.3d 1002, 1004 (9th Cir.1995). Rather, our "inquiry is at an end" once we determine that "the district court employed the appropriate legal standards which govern the issuance of a preliminary injunction, and ... correctly apprehended the law with respect to the underlying issues in litigation." Cal. Prolife Council Political Action Comm. v. Scully, 164 F.3d 1189, 1190 (9th Cir.1999) (internal citation and quotation marks omitted).
 
 
 22
 We review standing issues, including whether a particular party has standing, de novo. See Gospel Missions of Am. v. City of Los Angeles, 328 F.3d 548, 553 (9th Cir.2003); Fair Hous. of Marin v. Combs, 285 F.3d 899, 902 (9th Cir.2002).
 
 IV. Standing
 
 23
 The district court correctly concluded that plaintiffs have standing to challenge the County's decision to eliminate 100 beds from LAC-USC and to close Rancho.
 
 
 24
 To establish standing, plaintiffs must satisfy a three part test. First, they must suffer an "injury in fact" — a "concrete and particularized" and "actual or imminent" harm to a legally protectable interest. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, plaintiffs must demonstrate a "causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable" to the defendant's actions. Id. Third, it must be "likely" that plaintiffs' injury will be redressed by a favorable court decision. Id. at 561, 112 S.Ct. 2130.
 
 
 25
 A separate three-part test governs an association's standing to sue on its members' behalf: (1) the organization's members must otherwise have had standing to sue on their own; (2) the interests the organization seeks to protect must be germane to its purpose; and (3) neither the asserted claim nor the requested relief may require the members' individual participation in the suit. Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 848 (9th Cir.2002).
 
 
 26
 This action may go forward if at least one plaintiff has standing. See Pub. Citizen v. Dep't of Transp., 316 F.3d 1002, 1014-15 (9th Cir.2003); Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981).
 
 A. Injury In Fact
 
 27
 To satisfy the "injury in fact" requirement, plaintiffs must allege an imminent threat of concrete injury, and must distinguish themselves from the public at large by demonstrating that the alleged injury "affect[s them] in a personal and individual way." Defenders of Wildlife, 504 U.S. at 560 n. 1, 112 S.Ct. 2130; Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[T]he threshold question in every federal case ... is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of the federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf....") (quotation and citation omitted).
 
 
 28
 The "Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 160 (4th Cir.2000) (en banc); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). And this circuit recently confirmed that "a concrete risk of harm to the [plaintiffs]... is sufficient for injury in fact." Covington v. Jefferson County, 358 F.3d 626, 638 (9th Cir.2004) (emphasis added); see also Cent. Delta Water Agency v. United States, 306 F.3d 938 (9th Cir.2002) ("a credible threat of harm" constitutes "actual injury") (emphasis added); Hall v. Norton, 266 F.3d 969, 976 (9th Cir.2001) ("evidence of a credible threat to the plaintiff's physical well being" sufficient to satisfy injury requirement) (emphasis added).
 
 
 29
 In Covington, 358 F.3d at 638, the plaintiffs lived across the street from an improperly run landfill. The risk of fires, explosions, and groundwater contamination (among other problems) at the landfill was heightened because the facility was improperly run. We held that plaintiffs had standing to sue; because they lived close to (and down-gradient from) the landfill, the increased risk of injury they faced was "in no way speculative." Id. at 638 & n. 14. The probability that plaintiffs would be harmed because of conditions at the landfill was sufficient to satisfy the injury in fact requirement.
 
 
 30
 Similarly, in Gaston Copper, 204 F.3d at 150-51, the plaintiff property owner's lake was in the path of the defendant's toxic chemical discharge. The Fourth Circuit concluded the plaintiff had standing to challenge the defendant's discharge violations because his fear that the water in which he swam and fished would become contaminated was reasonable, and because he filed suit to "vindicate his private interests in his and his family's well-being." Id. at 156-57.
 
 
 31
 In contrast, in Defenders of Wildlife, 504 U.S. at 555, 112 S.Ct. 2130, the plaintiff organization challenged a government regulation that made the Endangered Species Act inapplicable to American actions in foreign nations. Two group members alleged they had observed the habitats of certain endangered species in foreign countries, and that they intended to return sometime in the future to try to see the animals. They feared that American involvement in foreign development projects would damage the habitats and therefore risk the animals' extinction. Id. at 563, 112 S.Ct. 2130. The Supreme Court concluded that the plaintiffs'"some day" intentions were insufficient to confer standing to sue. Id. at 564, 112 S.Ct. 2130.
 
 
 32
 The County's contention that plaintiffs' injuries are too speculative is unpersuasive. Plaintiffs are more like the property owners in Covington and Gaston Copper — in the path of likely danger from contaminants — than like the environmentalists in Defenders of Wildlife — with "some day" plans to travel abroad to try to observe an endangered animal. Plaintiffs introduced evidence that they rely on the county health care system. And, as chronically ill individuals, their future need for medical attention is far more certain than the intent to return to areas visited in the past alleged in Defenders of Wildlife. Further, plaintiffs have demonstrated that the County already has difficulty providing them access to timely care. Given the current crisis in the county health care system and the existing shortages and delays, it is not speculative to anticipate that reducing the resources available will further impede the County's ability to deliver medical treatment to plaintiffs in their times of need. Plaintiffs will inevitably face longer delays and suffer increased pain and complications if the County further reduces the available resources as planned. The threat of delayed treatment arising out of the County's decision to pare down its healthcare system threatens plaintiffs the same way conditions at the improperly run landfill endangered the plaintiffs in Covington and toxic discharge's future impact on a nearby lake threatened the plaintiff in Gaston Copper — it presents the proverbial accident waiting to happen.
 
 
 33
 We acknowledge that we rely on environmental cases for the proposition that plaintiffs need only establish a risk or threat of injury to satisfy the actual injury requirement. We see no principled distinction between those precedents and the instant case. Here, as in the earlier controversies, demanding that plaintiffs wait until they suffer physical harm to sue "`would eliminate the claims of those most directly threatened but not yet [damaged].... Article III does not bar such concrete disputes from court.'" Cent. Delta, 306 F.3d at 948 (quoting Gaston Copper, 204 F.3d at 160). Indeed, the imminent threat here — delayed treatment, physical suffering, medical complications, and death — provides a compelling reason to permit these plaintiffs to pursue judicial resolution before suffering physical injury.
 
 B. Causal Connection
 
 34
 Plaintiffs must also demonstrate that their alleged injuries would be caused by the challenged cutbacks. Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130.
 
 
 35
 The County's comparison of this case to Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), is unconvincing. In Allen, a nationwide class action, the parents of black public school students challenged the IRS's failure to ensure that racially discriminatory private schools were denied tax-exempt status. The plaintiffs alleged that the tax-exemptions enjoyed by racially discriminatory private schools diminished their children's ability to receive an education at a racially integrated school. The Supreme Court found those injuries "not fairly traceable" to the challenged government conduct because the following were uncertain: the number of racially discriminatory private schools receiving tax exemptions; whether withdrawal of a tax exemption from any particular school would lead the school to change its policy; whether any particular parent of a student at such private school would transfer the child to public school once it was threatened to lose its tax exempt status; and whether in a given community enough school officials and parents would make decisions with a collective significant impact on the racial composition of the public schools. Id. at 757, 758, 104 S.Ct. 3315.[4]
 
 
 36
 The County's contention that plaintiffs' injuries are too tenuously connected to the County's proposed closures is unpersuasive. As discussed above, the medical care the County offers at LAC-USC and Rancho is tightly linked to plaintiffs' health and well-being. Allen's multi-level uncertainty makes the decision readily distinguishable. The only true uncertainty here is when plaintiffs will next require medical treatment. Because there is no evidence that the County is relocating specialized services uniquely available at Rancho to other facilities, it is fairly certain that when plaintiffs do seek those services, they will not be available. And while we cannot know just how overcrowded LAC-USC might be when plaintiffs arrive, we do know that it is already overwhelmed, dysfunctional, and dangerous. Unlike Allen, there is no chain of causation involving third parties and speculation distancing plaintiffs' likely injury from the County's proposed cutbacks. Plaintiffs have alleged that they regularly seek medical care from one facility that the County is threatening to downsize and another that the County has decided to close altogether. With a health care system already struggling to address the medical needs of plaintiffs and other patients — and already frequently unable to provide timely treatment and providing some types of services only at a facility slated to close without a plan to relocate its specialized services to another location — it is a virtual certainty that the proposed cutbacks will negatively impact plaintiffs' access to necessary medical care.
 
 C. Redressability
 
 37
 In addition to establishing that their injury results from the defendants' challenged action, plaintiffs must also demonstrate that the requested relief will remedy their injury. See Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).
 
 
 38
 On this point, the County relies on Simon. There, indigent plaintiffs sued Department of Treasury officials, challenging provisions allowing favorable tax treatment to a non-profit hospital where plaintiffs were denied service. The Court concluded that plaintiffs lacked standing because, due to the attenuated chain of causation, there was no evidence that eliminating the challenged tax break would actually result in the non-profit hospital changing its practices in treating the plaintiffs. Id.
 
 
 39
 The instant case is distinguishable. Plaintiffs here sued the entities that operate the hospitals to which plaintiffs seek to retain access. The remedy they seek would directly change what the hospitals would do in the absence of this suit. The County is already struggling to provide basic health care services to its indigent residents, including plaintiffs. While the relief plaintiffs seek will not eliminate all harm caused by delays and insufficient resources, the district court's order requiring the County to keep Rancho open and maintain all beds currently provided at LAC-USC serves at least to maintain the status quo and to preclude any additional, avoidable harm to plaintiffs. Thus, the specific injuries plaintiffs allege already have been redressed by Judge Cooper's well-reasoned preliminary injunction order.
 
 
 40
 * * *
 
 
 41
 In sum, the district court did not err in concluding that plaintiffs have standing to pursue this action. First, the individual plaintiffs have chronic health conditions and rely on the county health care system, and specifically on Rancho and LAC-USC, for medical treatment and hospital care. Second, the County's proposed cutbacks will interfere with plaintiffs' access to (and decrease the quality and timeliness of) medical care. Finally, the injunctive relief plaintiffs seek (and already have received as a preliminary matter) will remedy that harm. Indeed, it is difficult to imagine individuals with greater personal interests in this matter than plaintiffs, who risk grave medical complications and suffering if the County is permitted to close Rancho and reduce the number of beds at LAC-USC.
 
 
 42
 In addition, we have no trouble concluding that LACEHH has standing. The organization's members — who include indigent individuals who depend on the county health care system — would otherwise have had standing to sue on their own, and neither the asserted claims nor the requested relief require the members' individual participation in the suit. See Nat'l Audubon Soc'y, 307 F.3d at 848. Further, the interests LACEHH seeks to protect in this lawsuit — indigent county residents' access to health care — are relevant to the organization's purposes of aiding homeless and low-income individuals in Los Angeles. See Warth, 422 U.S. at 511, 95 S.Ct. 2197.
 
 V. Likelihood of Success
 A. State Law Claims
 
 43
 The district court did not abuse its discretion in concluding that plaintiffs established a likelihood of success on the merits of their state law claims, predicated on California Welfare and Institutions Code sections 10000, 17000, and 17001.
 
 
 44
 Section 10000 requires the provision of "appropriate aid and services to all [of the State's] needy and distressed," and requires that aid be "administered and services provided promptly and humanely, with due regard for the preservation of family life...."
 
 
 45
 Section 17000 mandates that the County relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.
 
 
 46
 Finally, section 17001 provides that the county's Board of Supervisors "adopt standards of aid and care for the indigent and dependent poor of the county."
 
 
 47
 California has interpreted these sections to require a county to provide care even in the face of a budget shortfall. "A lack of funds is no defense to a county's obligation to provide statutorily required benefits." Cooke v. Superior Court, 213 Cal.App.3d 401, 413-14, 261 Cal.Rptr. 706 (1989) (holding that county must provide indigent residents with humane dental care sufficient to remedy substantial pain and infection). Therefore, the County's budget crisis is insufficient to establish that it could take these actions without violating sections 10000 and 17000.
 
 
 48
 The County also argues that it is not required to provide the level of care sought by the plaintiffs. However, the County's reliance on Hunt v. Superior Court, 21 Cal.4th 984, 90 Cal.Rptr.2d 236, 987 P.2d 705 (1999), for the proposition that the "subsistence medical care" that state law requires is defined as "medical services necessary for the treatment of acute life-and-limb-threatening condition[s] and emergency medical services" is misplaced. Hunt specifically held that it had "no occasion ... to determine the specific medical services a county must offer to provide residents with subsistence medical care." Hunt, 21 Cal.4th at 1014, 90 Cal.Rptr.2d 236, 987 P.2d 705. Hunt held only that the obligation extends "at least as far as ... medical services necessary for the treatment of acute life-and-limb-threatening conditions and emergency medical services." Id. (emphasis added). The holding creates a floor below which the level of services may not fall, but does not otherwise define the specific services that constitute subsistence medical care.
 
 
 49
 Further, County of San Diego v. State, construes section 17000 as "impos[ing] a mandatory duty upon all counties to provide medically necessary care, not just emergency care," to county indigents who have no other means to care for themselves. 15 Cal.4th 68, 104, 61 Cal.Rptr.2d 134, 931 P.2d 312 (1997) (citations and internal quotations omitted). And in Tailfeather v. Board of Supervisors, 48 Cal.App.4th 1223, 1240, 56 Cal.Rptr.2d 255 (1996), the court observed that "section 17000 requires provision of medical services to the poor at a level which does not lead to unnecessary suffering or endanger life and health."
 
 
 50
 The district court concluded that eliminating 100 beds at LAC-USC and closing Rancho will cause unnecessary suffering and will also threaten the life and health of indigent county residents, including plaintiffs. In the district court's view, the proposed reductions in service will deprive plaintiffs of medically necessary care, will endanger their health, and will lead to their unnecessary suffering, thereby violating the state law requirements described above.
 
 
 51
 The district court's factual findings are supported by the record, and the court relied on the correct legal standards in concluding that plaintiffs are likely to succeed on the merits. We find no abuse of discretion.
 
 B. Medicaid Claim
 
 52
 The district court also appropriately held that plaintiffs established a likelihood of success on their Medicaid discharge planning claim. Medicaid requires that participating hospitals plan for each patient's hospital discharge. Among other things, the regulations require hospitals to identify those patients who need a discharge plan and provide an evaluation to those patients and any others who request an evaluation. 42 C.F.R. § 482.43(a)-(b)(1). The evaluation must be timely so that arrangements for post-hospital care are made before discharge, and to avoid unnecessary delays in discharge. 42 C.F.R. § 482.43(b)(5). The hospital must transfer or refer patients to appropriate facilities, agencies, or outpatient services for follow-up or ancillary care. 42 C.F.R. § 482.43(d).
 
 
 53
 Plaintiffs allege that the County will violate these provisions if Rancho closes and its patients are left without a transfer plan. Although the County introduced evidence that it was negotiating contracts with private providers to render care to the affected individuals, there was no evidence that any arrangements actually had been made.
 
 
 54
 Further, plaintiffs demonstrated that closing Rancho will impede the ability of other hospitals to meet their discharge planning obligations, since county hospitals rely heavily — and for some conditions, exclusively — on Rancho for rehabilitative care.
 
 
 55
 Again, in reviewing the district court's decision and the record, we find neither an erroneous factual finding nor reliance on an inappropriate legal standard. The district court's conclusion that plaintiffs are likely to succeed on their Medicaid claim is sound. There was no abuse of discretion.
 
 VI. Balance of Interests
 
 56
 Plaintiffs introduced compelling evidence that they (and others) very likely will suffer irreparable harm if the County reduces the number of beds at LAC-USC and closes Rancho. This harm includes pain, infection, amputation, medical complications, and death due to delayed treatment. Although delays exist in the stretched county health care system already, exacerbation of the current overcrowded situation and additional suffering can be avoided if Rancho stays open and LAC-USC maintains its current capacity.
 
 
 57
 The likely harm to plaintiffs far outweighs any hardship the preliminary injunction causes the County. The budget shortfall the County is attempting to avoid through the proposed cutbacks will not occur until 2005-06. The injunctive relief granted is only preliminary; the County will have an opportunity to try this matter and defeat plaintiffs' request for a permanent injunction before its anticipated budget shortfall. And, as the district court observed, this court has maintained that "[f]aced with [] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir.1983).
 
 
 58
 Public interest considerations weigh on both sides of the scale. The County suggests that the injunction forces it to cut other important programs, such as vaccinations, routine physicals, and well-baby care for those patients who do not fall under the strict statutory definition of indigent. But whether any or all of those programs will actually be impacted by the court's injunction is much more speculative than the probable injury the chronically ill plaintiffs face absent preliminary injunctive relief. The district court did not abuse its discretion by concluding that the public interest favored issuance of a preliminary injunction.
 
 VII. Conclusion
 
 59
 Plaintiffs have standing to challenge the County's decision to close Rancho and to eliminate 100 beds at LAC-USC. Plaintiffs may not yet have been injured by the County's proposal, but the potential harm is far from hypothetical. Whether the closures will negatively affect plaintiffs is not in question; only the precise timing and severity of the impact are in doubt. The evidence suggests that serious harm will follow closely on the heels of the proposed reductions in service.
 
 
 60
 Our review of the decision to grant a preliminary injunction is limited and deferential. The district court applied the appropriate legal standards in evaluating the merits of plaintiffs' claims and weighing their compelling evidence of irreparable harm against the hardship of an injunction on the County. We therefore affirm the district court's decision to grant the preliminary injunction.
 
 
 61
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Robert E. Cowen, Senior United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 Defendants, the Board of Supervisors of Los Angeles County, the Los Angeles County Department of Health Services (DHS), and Thomas Garthwaite, Director of DHS, are referred to herein as the "County."
 
 
 [2]
 Rodde v. Bonta, 357 F.3d 988 (9th Cir.2004), addresses the County's decision to close Rancho, but not its proposed reduction of beds at LAC-USC. In Rodde, Medi-Cal patients with special needs that require medical services offered at Rancho challenged the County's decision to close that facility. We affirmed the district court's order granting the Rodde plaintiffs a preliminary injunction.
 
 
 [3]
 In an attempt to show an abuse of discretion, the County argues that the district court applied the wrong preliminary injunction standard. We rejected the County's argument that the district court should have applied a heightened preliminary injunction standard inRodde, 357 F.3d at 994 n. 8, and we reject the argument here. The district court did not abuse its discretion by relying on the well-established preliminary injunction standard uniformly used in this Circuit.
 
 
 [4]
 Warth, 422 U.S. at 490, 95 S.Ct. 2197, is similar to Allen with respect to the attenuation between plaintiffs' injury and defendants' challenged conduct. In Warth, low and moderate income plaintiffs challenged a zoning ordinance that, among other things, allocated 98 percent of vacant land to single-family detached housing and effectively excluded plaintiffs from living in town. The court held that causation was lacking because plaintiffs' ability to find affordable housing in town depended on the willingness of third-party developers to create low-cost residences; the plaintiffs'"inability to reside in [town] is the consequence of the economics of the area housing market, rather than of [the challenged zoning ordinances]." Id. at 506, 95 S.Ct. 2197.